Betty K. FURUMIZO, Cynthia H. Furumizo, a minor, by Betty K. Furumizo, her Guardian Ad Litem, and Betty K. Furumizo, Administratrix of the Estate of Robert Takeo Furumizo, Deceased, Plaintiffs,

v.

UNITED STATES of America and Baker Aircraft Sales, Inc., Defendants.

No. 2091.

United States District Court
D. Hawaii.

June 21, 1965.

As Corrected Sept. 9, 1965.

E. D. Crumpacker, Honolulu, Hawaii, for plaintiffs, Crumpacker & Sterry, Honolulu, Hawaii, of counsel.

Frank D. Padgett, Honolulu, Hawaii, for defendant Baker Aircraft Sales, Inc., Robertson, Castle & Anthony, Honolulu, Hawaii, of counsel.

Herman T. F. Lum, U. S. Atty. for District of Hawaii, T. S. Goo, Asst. U. S. Atty., Charles J. Peters, Federal Aviation Agency, Washington, D. C., for defendant U. S. A., John W. Douglas, Asst. Atty.

983

984

Gen., Civil Division, John G. Laughlin, Atty., Dept. of Justice, of counsel.

TAVARES, District Judge.

1. For convenience of cross-reference in this necessarily lengthy decision each paragraph is given a consecutive number. It should be specially noted that where quotations are hereinafter made from statutes, regulations, or other exhibits, unless otherwise indicated, the italicized portions of the quotations signify emphasis added by the Court. This will avoid repetitious notations to that effect under each quotation.

2. This is a civil action for damages resulting from the death of Robert Takeo Furumizo (hereinafter called "decedent") as a consequence of an airplane crash at Honolulu International Airport on June 19, 1961. The action is maintained by Betty K. Furumizo, widow of decedent, in three counts: (1) As Administratrix of the Estate of Robert Takeo Furumizo, the decedent, having been so appointed on October 5, 1962, by order of the Circuit Court of the First Circuit, State of Hawaii, in Probate No. 23390; (2) in behalf of herself individually; and (3) by the said Betty K. Furumizo, as parent and guardian ad litem and in behalf of Cynthia H. Furumizo (hereinafter called "Cynthia"), a minor born January 4, 1961, the daughter of the decedent, said Cynthia having no other legal guardian of her estate or person.

3. The action is brought against the defendant United States of America (sometimes hereinafter called the "defendant USA" or "the government") under the Federal Tort Claims Act (28 U.S.C., Chapter 171, § 2671 et seq.) and against the defendant Baker Aircraft Sales, Inc., now known as Alaska Transportation Company (hereinafter called Baker), based upon diversity of citizenship and the amount in controversy. (28 U.S.C. § 1332) The action was tried by the Court without a jury.

4. This type of joinder is permitted by Rules 17 to 20 inclusive of the Federal Rules of Civil Procedure. Jurisdiction is conferred on this Court by 28 U.S.Code, § 1346, insofar as the defendant USA is concerned, and the cause is triable without a jury under Section 2402 of Title 28.

5. From facts stipulated and other evidence, it is found by the Court that, as between the plaintiffs and defendant Baker, there is diversity of citizenship in that the plaintiffs are all citizens of the State of Hawaii and the defendant Baker is a California corporation with its principal place of business in the State of California. At the time of the accident Baker was authorized to do business in the State of Hawaii and was doing business therein as Hawaiian Aircraft Sales. The Court also finds that the amount in controversy does exceed $10,000.00.

6. Liability is denied by the defendants Baker and USA. Baker has raised as special defenses those of contributory negligence and assumption of risk by the decedent. Defendant Baker has also under Rule 14 brought in defendant USA as a third-party defendant, contending that if there was any negligence which caused the accident, it was the negligence of the third party defendant USA and that, even if Baker is found to be negligent, the alleged negligence of the defendant USA contributed to the accident and therefore any judgment in favor of the plaintiffs should be either paid by the USA or contributed to in such proportion as the Court finds is justified.

7. The defendant USA denies any negligence on the part of its agents or employees and denies any liability to plaintiffs. It also raises three affirmative defenses, namely: (1) that the amended Complaint fails to state a claim upon which relief can be granted against the said defendant, (2) that the Court does not have jurisdiction over said defendant because the Amended Complaint does not set forth a claim for which defendant would be liable to decedent had he survived, in accordance with the law of the place where the alleged negligence of the defendant occurred, and (3) that the Court does not have jurisdiction over

the defendant USA because the alleged claims come within the exception contained in 28 U.S.Code, § 2680(a).[1]

8. The defendant Baker also sets up several affirmative defenses in its answer to the Amended Complaint, including the two, hereinabove mentioned, of contributory negligence and assumption of risk, a third being that the Amended Complaint fails to state a claim upon which relief can be granted against the defendant.

9. All of the three affirmative defenses raised by the defendant USA (para. 7 supra), and the third affirmative defense raised by defendant Baker, (para. 8 supra) were disposed of adversely to the defendants raising the same and in favor of the plaintiffs by the Court's decision on motion for judgment on the pleadings filed herein on June 24, 1963, and by judgment thereon entered on July 3, 1963.

10. The overall theory of the plaintiffs is substantially as expressed in paragraph 1 of the theories of the parties set forth in the Pretrial Order as follows:

"Plaintiffs contend that as citizens of the United States they have a claim against the Defendant USA under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671, et seq. for the negligence of the agents or employees of the Defendant USA while acting within the scope of their employment, having full knowledge of the hazards involved, in negligently failing to provide proper and adequate safeguards for the protection of the decedent from the hazards of 'turbulent wake' at the time of the accident and for negligently clearing the small aircraft in which the Decedent was a student pilot receiving dual instruction, for takeoff directly into the 'jet wash' of a DC–8 which had just previously taken off at Honolulu International Airport on June 19, 1961, thereby causing the aircraft to crash, resulting in the death of the Decedent and damages to the Plaintiffs as hereinafter more fully set forth."

11. The plaintiffs' claim against Baker is substantially set forth in the same Pretrial Order as follows:

"Plaintiffs further contend that under 28 U.S.C. § 1332 as citizens of the State of Hawaii they have a claim in an amount exceeding, exclusive of interest and costs, the sum of $10,000, against the Defendant BAKER as a California corporation with its principal place of business in California, for the negligence of its employee CHARLES ISAMU SHIMA (hereinafter referred to as 'SHIMA') while acting within the scope of his employment, as pilot in command of the aircraft in which he was giving dual instruction for hire to the Decedent as a student pilot, in taking off or allowing the Decedent to take off directly into the jet wash of the DC–8 aforesaid in spite of his knowledge as well as a specific warning given to him of the hazard involved, and in failing thereafter to maintain safe control of the aircraft under the circumstances, thereby causing the aircraft to crash, resulting in the death of the decedent and damages to the plaintiffs * *."

12. On June 19, 1961, at Honolulu International Airport in the District of Hawaii the decedent was a student pilot receiving instruction for hire from Charles Isamu Shima, hereinafter called Shima, an employee of the defendant

[1.] This portion of the Federal Tort Claims Act reads as follows:
"The provisions of this chapter and section 1346(b) of this title shall not apply to—
(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

Baker acting within the scope of his employment in a Piper PA–18 Super Cub 95, Reg.No.N–3299Z, which was then owned and being maintained by defendant Baker, its agents, servants or employees. George R. Carter was an employee and the managing agent in Honolulu of defendant Baker at that time. For brevity, this Piper PA–18 Super Cub 95 will be hereinafter sometimes called simply the Piper.

13. At the same time and place, and before, during and immediately after the accident, the defendant USA in connection with its prescribed air traffic activities was operating an air traffic control facility at Honolulu International Airport through air traffic controllers who were regularly in the service and employ of the Federal Aviation Agency (hereinafter called FAA) of the defendant USA. William R. Humphreys [2] was the local controller-trainee operating the "local control" position under the direct supervision of Porfirio Garcia, the chief controller, who had overall charge of all the controllers, Donald H. Capellas, who was handling the "ground control" position, and another FAA employee, Mr. Severn Krogh.

14. At approximately 18:56 Honolulu Standard Time (6:56 P.M. local time) on said date, the Piper was involved in an accident at Honolulu International Airport, as a result of which a conflagration occurred causing the death of the decedent Furumizo, and of Shima, the employee of the defendant Baker.

15. The Piper was a two-place tandem (fore and aft seating) aircraft with a full set of controls at each of the two positions and at the time of the accident the decedent was in the forward cockpit and Shima was in the rear cockpit.

16. The purpose of the flight which resulted in the accident was "dual instruction" in takeoffs and landings for the student pilot decedent, with Shima as the flight instructor, and immediately prior to the accident the Piper had made a series of takeoffs and landings while remaining in the airport traffic pattern.

17. At the time of the accident the decedent had received a total of ten hours and forty-five minutes of dual instruction over a period of the immediate past two months, but had not yet soloed. Decedent held an FAA Student Pilot's License and a current Second Class Medical Certificate.

18. At the time of the accident the weather report taken at 18:55 Honolulu Standard Time, or 6:55 P.M., was: estimated scattered clouds at 3,000 feet, visibility over 15 miles, temperature 78 degrees, dew point 66 degrees, wind 6 knots from the East Northeast. Sunset on that date was at 19:16 Honolulu Standard Time (7:16 P.M.) or within two minutes of that time.

19. The Piper in which Furumizo was riding as student pilot, and Shima was riding as instructor, had previously been given clearance or authorization by the control tower to make practice landings and takeoffs, which ordinarily are done in a continuous series of motions, that is, the plane lands, rolls on the runway, and takes off again without coming to a stop. Just before the final landing of the Piper and thereafter the following radio or tower transmissions were made by the Tower Controller to the Piper (as per Exhibit P–5, which numbers consecutively each of a series of transmissions preceding, leading-up-to, and following the accident. The numbers preceding each of the following quotations for Exhibit P–5 are penciled numbers written in by plaintiffs' counsel with the Court's approval, to identify each transmission):

"4. PIPER NINE ZULU [referring to the Piper here involved] CONTINUE DOWNWIND."

2. Humphreys had died before the trial and Krogh was not available within the jurisdiction. Hence only Capellas and Garcia testified as to the actual accident, and Capellas was the only one who had witnessed the entire transaction from beginning to end.

Krogh was operating the Flight Data position in the tower, as well as Clearance Delivery.

\* \* \* \* \* \* ·

"8. PIPER NINE ZULU NUMBER TWO FOR FOUR LEFT FOLLOW THE DC THREE TURNING A SHORT FINAL FOR FOUR LEFT."

\* \* \* \* \* \*

"11. PIPER NINE NINE ZULU CONTINUE APPROACH NOW FOR FOUR LEFT."

\* \* \* \* \* \*

"14. PIPER NINE NINE ZULU CONTINUE APPROACH NOW FOR FOUR LEFT DC THREE RIGHT BASE THE OTHER RUNWAY."

\* \* \* \* \* \*

"19. PIPER NINE NINE ZULU MAKE THIS A FULL STOP HOLD SHORT OF EIGHT IF POSSIBLE."

20. The Piper then landed on runway 4–L and stopped at the midway taxi strip short of the intersection of 4–L and runway 8.[3]

21. The next tower transmission to the Piper was:

"28. PIPER NINE NINE ZULU PULL AHEAD SLIGHTLY ALLOW THE DC THREE TO PASS BEHIND YOU."

This transmission was complied with, and after the next three tower transmissions, the DC–8 was cleared for takeoff by transmissions reading:

"30. JAPANAIR EIGHT ZERO ZERO FIVE WIND NORTH NORTHEAST SIX CLEARED FOR TAKE-OFF."

[The reference to Zero Zero Five is admittedly an error and should have been Zero Zero Six]

\* \* \* \* \* \*

"32. JAPANAIR EIGHT ZERO ZERO SIX CLEARED FOR TAKE-OFF."

22. After the next four transmissions the tower instructed:

"37. PIPER NINE NINE ZULU HOLD YOUR POSITION."

From this it is inferable and was assumed by the witness Garcia, that the Piper had continued to taxi forward after transmission No. 28.

23. Apparently at this time a C–47, which is the military equivalent of a DC–3, was waiting at the approach end of runway 4–R for a takeoff. It was then being operated by two officers, McCann and Garland, Garland being pilot and McCann co-pilot at the time. Having asked for and been denied clearance because of the imminence of the takeoff of a JAL DC–8, the following tower

---

3. An actual clearance to land as required by the regulations was never given by the tower controllers to the Piper, although it is undisputed that transmission No. 28 was given after the Piper had actually landed—a very substantial omission and irregularity that Mr. Garcia, the chief controller, was unable to explain, as indicated by the following cross-examination of Chief Controller Garcia:

(Questions by Mr. Padgett)

"A The only reference I can make here is that Piper 99 Zulu was cleared, was just on 19, where he was advised to make his landing at full stop and hold short of 8, if possible. However, there is no clearance for him to land there, if that is what you are indicating.

"Q There was no actual verbal clearance issued for him to land?

"A Not that I recall."

\* \* \* \* \*

"Q Well, how is it that he can get in and make a landing without you people clearing him to land?

"A I can't explain that."

Yet the government contends that in all of the controller's actions with reference to issuing the take-off clearance to the Piper they acted in strict and literal accordance with the official regulations and directives. Although the government purports to rely strictly upon the "book" in respect of this take-off clearance, it seems clear to this Court that there were many irregularities and deviations from the strict language of the "book" during the period before, and continuing until after the crash of the Piper, which, to this Court, means that the "book" did not foreclose individual judgment and discretion as to many things claimed by the government to be strictly regulated by the "book".

transmission then was given, referring to the said C–47:

"43. AIR FORCE SIX THREE THREE EIGHT CAUTION TURBULENCE DEPARTING DC EIGHT CLEARED FOR TAKE-OFF."

24. The next transmission which followed immediately after the clearance of the C–47 was:

"44. PIPER NINE NINE ZULU CAUTION TURBULENCE DEPARTING DC EIGHT CLEARED FOR TAKE-OFF."

25. It will be noted that under then standard procedure the recording mechanism at this tower did not pick up and record messages *received* from the airplanes to which the messages were addressed. Only *outgoing* messages from the tower were recorded.

26. The Piper's specifications were:

(a) gross weight approximately 1,-500 pounds when fully loaded with a 700 pound load;

(b) top speed 112 miles per hour;

(c) cruising speed at 75% power, 100 miles per hour; stalling speed, 42 miles per hour.

27. The specifications for the Japan Airlines DC–8 in the wake of which the Piper was caught, as hereinafter found, were as follows:

1. Flap setting and air climb-out speed (if R/W Temp. was 15° C) 15° flap; V2=166 knots.

2. Gross take-off weight; 310,262 lbs.

3. Wing span: 142 feet, 4.5 inches.

28. At the Honolulu International Airport, where the accident occurred, Runway 4 is a complex of runways having two main center runways which run in an approximate Northeast-Southwest direction; this complex intersects a much longer jet runway, being runway 8, which runs in a rough East-West direction. The two longer runways of the runway 4 complex, each of which is approximately 180 feet wide are denominated Runway 4 Left and Runway 4 Right (hereinafter

called 4–L and 4–R), which runways are approximately 280 feet apart, and which intersect runway 8 at an angle of about 40 degrees near its easterly end.

29. The Court finds from the evidence, that the assumptions made by the expert witness Professor Lissaman, called by the plaintiffs, whose qualifications, candor and reasons for his opinions strongly impressed this Court, were sound and amply supported by the evidence, insofar as the assumptions were material to the conclusions reached by this expert. This was the only expert witness called on the scientific aspects of wake turbulence. Hence, his conclusions stand uncontradicted by any competent expert.

30. These assumptions included, or coincide with, or are not inconsistent with, some or all of the following, which are found by this Court to be facts, as well as the other facts found in this decision:

a. That the DC–8 had a wing span of 142 feet 4½ inches, a gross takeoff weight of 310,262 pounds, as it commenced its takeoff roll, after receiving a takeoff clearance.

b. That the accident occurred 20 minutes before sunset at approximately 6:56 p. m. Honolulu Standard Time on June 19, 1961, at Honolulu International Airport, as depicted by Exhibit P–1, under the conditions stated in the preceding paragraphs of this decision.

c. That the DC–8 with the aforesaid wingspan and takeoff load, after receiving its takeoff clearance as hereinabove found, with a flap setting of 15 degrees, and with a north, northeast wind of 6 knots, commenced its takeoff run at 6:55 p. m.

d. That it reached an air speed of 100 knots on the ground in approximately 29½ seconds; that its rotation speed was about 156 knots, and that it broke ground at approximately 160 knots prior to the intersection of runways 4 with runway 8, in approximately the vicinity of the midfield taxi strip shown in Exhibit P–1; that it passed over the intersection of

runway 4 right, at approximately 150 to 200 feet altitude; that it passed the end of runway 8 with its landing gear either retracted or in the course of being retracted, that it accelerated to a speed of approximately 176 knots, making a normal climb-out, and turning to its departure heading of 150 degrees substantially as depicted by the red broken line on Exhibit P-1, running from the end of runway 8 to a spot marked X and identified with the letter G with an arrow pointing to said X.

e. That immediately after the DC-8 cleared the intersection of runways 4 and 8, the C-47 with a wing span of 94 to 95 feet and a gross takeoff weight of approximately 22,000 pounds, and a climb-out speed of approximately 120 miles per hour, was given a takeoff clearance from its position at the southwesterly end of runway 4 right, being the down-wind end; the C-47 did not immediately take off, but waited from 30 to 40 seconds longer than it normally would have because of the warning on turbulence issued by the tower. That immediately after clearing the C-47, the control tower, through Humphreys, supervised by Garcia, cleared the Piper for takeoff with the same warning on turbulence given the C-47, and hereinabove quoted, and the Piper immediately commenced its takeoff roll at the approximate spot marked G-2 on Exhibit P-1, at approximately 1,000 feet from the point where it finally crashed on the ground later.

31. The sequence of time in connection with the takeoff roll was as follows:

a. As soon as the DC-8 crossed the intersection of runways 4 and 8, the Local Controller Humphreys, who was backed up by Garcia with an overriding mike, and who had been told by Garcia to issue a turbulence warning, issued in immediate sequence the takeoff clearances, first to the C-47 and then to the Piper, as hereinabove quoted (paras. 23 and 24 ante).

b. Garcia gave two somewhat conflicting versions of the sequences:

(1) In one of them, on direct examination, he said that he had been watching the DC-8 and, as it passed the intersection of runways 4 and 8, he heard Humphreys give the clearance to the C-47 and immediately turned his attention back to the area of the C-47; that he saw the Piper commence its takeoff roll following its clearance, and immediately turned back and looked at the DC-8 and found at that moment that it was over the Bascule Bridge at Sand Island at a heading of approximately 150 degrees.

(2) On cross-examination by Padgett for Defendant Baker, Garcia admitted that in his previous deposition he had said he had observed the DC-8 retracting its landing gear and passing over the end of runway 8.

c. In an attempt to reconcile his testimony on direct examination by Crumpacker with his deposition in this respect, Garcia said that he watched the DC-8 pass the intersection of runways 4 and 8 and retracting its landing gear as it passed over the end of runway 8, and that at that moment he heard Humphreys give the clearance to the C-47 and immediately looked back to the area of the C-47 and observed the Piper commence its takeoff roll, at which moment he immediately looked back to the DC-8 and saw it approximately over the Bascule Bridge.

d. Taking into consideration normal reaction time, this Court believes that what happened was that Humphreys gave the clearance just as soon after the DC-8 cleared the intersection as he could with normal speed, that by the time he got through giving the clearance to the C-47 and was in the process of giving the clearance to the Piper, somewhere about this time Garcia reacted and turned his eyes back to the C-47 and incidentally to the Piper, because both were within the same general direction of vision, and he could undoubtedly see both at the same time. The normal reaction time and the time it took for Humphreys to say the words for clearance would account for the DC-8 commencing to retract its landing gear and passing or being about to pass over the end of runway 8. In either event, the difference would be a

matter of a very few seconds. After observing the Piper commence its takeoff roll, and immediately thereafter looking back to the DC-8 and observing it approximately over the Bascule Bridge, Garcia turned his attention back to the general area of the C-47 and Piper and at that moment observed the Piper in an attitude such that its fuselage was parallel to the surface of the runway and its right wing at right angles to the surface, with the plane falling rapidly to the ground, and saw it hit the ground.

32. The only testimony we have from an eye-witness of the Piper's movements from the commencement of takeoff until the crash is that of the witness Capellas who was Ground Controller. From this witness's statements, as well as other evidence, the Court finds that the Piper started its takeoff roll from the point indicated by both Garcia and Capellas, approximately 1,000 feet from the point of the actual crash, that it made a good takeoff run and a good normally appearing initial climb, that thereafter it assumed an attitude abnormally nose-high as it was about to pass the tower, which is practically at right angles to the northeasterly, southwesterly line of runway 4-L, at an altitude between 50 and 75 feet, that its right wing then dropped until it was practically perpendicular to the runway and the Piper fell off to the right and crashed at the intersection of runways 4-L and 8, where it burst into flames.

33. There is a great deal of testimony from this witness as to whether he had said the plane was a "little" nose-high, or "excessively" nose-high, and the Court gained the distinct impression that this witness, although trying to be honest, was nevertheless slanting his testimony toward creating an impression—which the government has throughout this case attempted to sell to this Court—that the cause of the accident was a mere stall, rather than the turbulence caused by the departing DC-8.

■■ 34. At any rate, regardless of what Mr. Capellas or Mr. Garcia or any other witness has testified to, along any line which might tend to indicate a mere stall, this Court finds that the evidence overwhelmingly proves that the cause of the accident was turbulence caused by the departing DC-8. More specifically, this Court is fully convinced that the little Piper encountered the left vortex of this large departing DC-8 and that the turbulence caused by this vortex fully accounts for all of the abnormal activities of the Piper from the time it assumed its unnaturally nose-high attitude until it crashed. This Court is also fully convinced from the evidence, including especially that of the expert witness Lissaman, that the turbulence encountered was so violent that the little Piper once caught in it had no chance of avoiding a crash—in other words, that the strength of the turbulence was so great as to overcome any ability of the Piper to overcome it.

35. In this connection, this Court has carefully considered, along with every other aspect of the evidence, the testimony of the expert witness Alfred Anthony who testified to the conditions he found in the burned Piper after the accident, including such matters as the folded-up right wing, the angle of the Piper with respect to the longitudinal axis of runway 4-L, the position of the throttle, the appearance of the propeller blades, etc. None of these impressed the Court in the light of all the evidence, as indicating any negligence on the part of Shima or Furumizo in the actual operation of the Piper, other than the possibility of negligence in taking off when the Piper did.

■■ 36. The Court's ultimate ruling in this case may be summed up thus: Baker had the duty, equal to the highest duty a commercial airline owes to its passengers, of care in furnishing instruction to Furumizo, the student pilot who had not yet soloed. Shima, the instructor pilot, although apparently otherwise well qualified, quite evidently had not sufficiently absorbed the dangers of vortex turbulence from large planes, such as the DC-8, to tiny planes like the Piper to

realize that by taking off from a point as close to the intersection as it was, and crossing runway 8 at an angle of only 40 degrees, with a cross-wind of the type shown, he would be almost certain to encounter such turbulence at its maximum degree of danger. Therefore Baker was negligent in not having furnished an instructor who was so fully aware of such dangers that he would have avoided taking off when and under the circumstances he did.[4]

37. Furumizo was not negligent in any manner in this respect, since his instructor was in charge of the plane, and at takeoff especially would be the one to exercise judgment in accepting clearance from the tower.[5]

38. This negligence of Baker, since it antedated the actual takeoff of the Piper, was not the sole and last independent cause of the accident, but continued as a contributing cause from before the accident until it happened. Had Shima been an adequately trained pilot, and had he been adequately instructed and made fully aware of the dangers of large plane wake turbulence to small planes, the Court cannot believe that he would have taken off at the time and under the circumstances he did, the evidence indicating that he was a careful and

4. It was stipulated that: "The existence of the potential hazards of turbulent wake of large aircraft to smaller aircraft was a matter of 'common knowledge' in the flying industry and specifically to the employees of the defendant U.S.A. and more particularly those in the F.A.A. at the time of the accident."

The evidence, however, indicates that this "common knowledge" was largely a vague general idea that such wakes were somehow dangerous to smaller aircraft, but this Court is convinced from the so-called "expert" pilot witnesses who were called by the various parties, that a very substantial proportion of airplane pilots, other than those piloting large commercial airplanes, did not clearly understand the principles and functioning of such wakes—for instance the principle that the sharper the angle at which an airplane entered into the vortex of such wake, the more violent and dangerous would be the result on manageability of the airplane; and that such wakes would persist for a duration of from 30 to 60 seconds and for a distance of from one to three miles after the passage of the large airplane which caused it, that the roll effect of a trailing vortex from a large airplane could exceed the aileron controllability of a small airplane flying parallel to it, and that such wakes would descend slowly until they were near the ground. Under the stipulation so entered into and the other evidence in this case, a qualified pilot should have known these principles and been aware of the violent danger of entering such vortices with small planes, especially at an acute angle, not to speak of any other angle. But, as above stated, this Court finds from the evidence that not only was there a substantial number of licensed pilots who did

not adequately understand such principles or fully realize such danger, but that the F.A.A. and its agents and employees had ample warning and notice of this and knew or should have known that this was so, and should have been prepared to meet situations where it was quite obvious or apparent that such pilots either did not know the hazards they were about to incur, or were dangerously ignoring such hazards.

5. There was no direct evidence that decedent had actually been instructed adequately or at all on the dangers of large plane wake vortices or turbulence, although there is some weak evidence from which an inference was attempted to be drawn by the defendants to the effect that he must have received some instruction on such matters. For example, one of his former instructors testified that it was customary for him to give certain instruction on wake turbulence to his students at a particular stage during the ten hours and forty minutes of flying instruction that Furumizo was shown to have had and there is evidence that various information bulletins customarily mailed to all pilots and flying schools, etc., were posted on the bulletin board and presumably read by all, including students like Furumizo. However, the Court finds such alleged evidence insufficient to establish by a preponderance of the evidence, or at all, that Furumizo actually had been instructed on the dangers of wake turbulence and therefore knew or should have known about it. The Court therefore rejects any theory of contributory negligence or alleged assumption of risk based on any alleged knowledge or presumption of knowledge on the part of Furumizo concerning the dangers of wake turbulence.

prudent person, not one given to taking undue chances. A well-trained pilot, adequately schooled in the actual dangers to planes of the size of this Piper of turbulence created by planes of the size of the DC–8, would have done what the pilots of the C–47 did—wait until a reasonable time had elapsed to allow the most violent aspects of the turbulence to dissipate before taking off at an angle that would most certainly cross the path of the turbulence, and most likely in the actual vicinity of it, and at an angle so closely parallel to the path of the turbulence, as to increase the danger of turbulence to its extreme degree.

■ 39. The government ·was negligent in that under then existing laws and regulations it had a duty to exercise judgment to attempt to avoid danger where such danger was, or should have been, obviously imminent under the circumstances—namely, a takeoff from a point in close proximity to an intersecting runway, at a sharp, acute angle less than 45 degrees, with a 6 knot wind blowing close to the same direction as the turbulence would be running along the runway of the takeoff of the large plane, at a time less than one minute after the creation of the turbulence at the intersection, and noting and observing that the Piper immediately took off upon receiving clearance which was given immediately after the large plane cleared the intersection, so that it should have been obvious to a well-trained tower controller that under such circumstances the little plane must almost inevitably encounter extremely violent turbulence at an angle to be destructive and to be imminently dangerous to the plane and its occupants.[6]

40. The government attempted to justify its controllers by the claim that they did everything they were required to do under the circumstances. This Court holds otherwise. The mere statement of a warning as to turbulence, with full knowledge that the little plane was taking off immediately, should have indicated to the tower personnel that regardless of what they thought well-trained pilots generally ought to know, the pilot of this tiny plane either did not know it, or was commencing a takeoff that can only be described as extremely hazardous, or suicidal.

41. Had the tower personnel attempted to exercise their reasonable judgment and attempted to hold up the clearance a sufficient time to minimize the acute danger at this point of the intersecting runway, and had the accident happened nevertheless, it might then be argued that the government should not be held liable for a mere mistake exercised in good faith, but with the wrong result. Here, however, this Court finds that there was a complete and callous *disregard of any duty to exercise judgment whatsoever*, and from the lips of Garcia himself, the man in charge of the tower, *no judgment was exercised*. There was simply a slavish purported following of the "book", with no attempt to exercise a judgment, which under the circumstances it was the duty and within the power of the controller to exercise, and which would and could have avoided this accident.

■ 42. The Court holds that this failure to exercise any judgment under the circumstances constituted negligence on the part of the tower controllers and was a contributing cause of the accident, along with the negligence of the defendant Baker in not furnishing in Shima an adequately informed and trained pilot, and finds that each is equally liable, and that each should pay one half of the judgment to be entered pursuant to this decision.

43. In an effort to persuade this Court to change its thinking about the liability of the government, the latter filed two memos after the Court announced its tentative oral ruling. The Court has carefully studied every decision cited and every argument of the government and is not persuaded that its orig-

6. Professor Lissaman testified that such turbulence could flip over such a small plane as the Piper, even on the ground.

inal impression and finding of liability on the part of the government was erroneous. Among the decisions so cited by the government are those hereinafter next cited.

44. This Court has no quarrel with the principle claimed by the government as held in Social Security Administration Baltimore F. C. U. v. United States, D.C., 138 F.Supp. 639, 645, (which was not an accident case and did not involve aircraft or the F.A.A. or its predecessor) to the effect that a plaintiff suing under the Federal Tort Claims Act (FTCA) must prove all three of the elements of actionable negligence: (1) a duty on the part of the government to protect plaintiff from the injuries suffered; (2) the government's failure to perform that duty; and (3) an injury to plaintiff proximately caused by such failure. Unlike the situation in the Social Security Administration case where there was no law casting upon the government any duty to make a comprehensive and active audit of Federal Credit Union accounts for the protection of credit unions, in this case we have a *statutory duty imposed* upon the F.A.A. to provide for *safety* of aircraft, and a *rule having the force and effect of law prescribing the same thing*, with other indications hereinafter mentioned, *of duties relating to safety of the aircraft*. While quoting various portions of 49 U.S.C. § 1348(b) as to the administrator being authorized within the limits of congressional appropriation to operate air navigation facilities and provide necessary facilities and personnel for the regulation and protection of "air traffic", the government significantly omits paragraphs (a) and (c) of that section which *emphasize the safety and protection of aircraft through air traffic rules and regulations*.[7] Thus, we find the government emphasizing *traffic regulation* pure and simple as the *only criterion* by which to judge the duties and performance of control tower operators, *whereas the statute and the regulation* having the force of law adopted pursuant thereto, *equally stress the safety and protection of aircraft.*

45. Smerdon v. United States (D.C. Mass.1955), 135 F.Supp. 929, is not persuasive in this case. There the administrator of deceased passenger Barnes sued under the Federal Tort Claims Act. The plane, a Beechcraft Bonanza, a four-place, low-wing monoplane, capable of instrument as well as visual rules flight, and actually on an instrument rules flight plan, approached Logan International Airport, a fogged-in airfield, and was duly warned as to insufficient visibility conditions and the fact that they were unable to furnish a ground control approach due to precipitation clouding the scope of their radar equipment. Nevertheless, the pilot, Smith, insisted on asking Logan International Airport for V.F.R. landing permission, because the pilot had heard the control center finish broadcasting a proper and accurate report of good visibility weather conditions at Bedford airport (a different airport from that over which the pilot was), and mistakenly understood the broadcast to refer to the Logan Airport. This misunderstanding was due in no way to the fault of the Logan control official. The pilot himself reported to the tower officials, *who were under a tent to facilitate radar viewing and did not have visual access to the field*, that he could see certain landmarks near Logan and the end of one runway at the airport itself, and based upon his own mistaken belief that the weather report for Bedford represented the weather for Logan Field, and his own visualization of the Logan Airport, which he reported to the Logan people, he requested and received visual flight rules clearance to enter an approach at Logan. Smith believed that any obscuration that he observed on the harbor was thin and would be a temporary impediment to visibility and therefore entered the approach for landing and commenced his gliding path from 500 feet altitude, meanwhile letting down his landing gear from their retracted posi-

---

7. See post, paragraph 57 for quotation of these subsections.

tion. This created a drag on the plane which, unless countered by trimming the horizontal stabilizers or otherwise offsetting them by steering devices, would tend to cause the nose of the plane to dip. When the plane was a half a mile from the end of the runway, Smith entered an area of fog, but mistakenly believing it to be a temporary obscuration, he continued and crashed into the water of the harbor, resulting in drowning his passenger Barnes, although he and another passenger escaped.

As the court in that case said:

"In this case Smith furnished the information to the Logan tower operator that from where he was flying visibility was within the minimum for VFR. The tower operator had furnished and continued to furnish the official Boston Weather Bureau reports to indicate that at the field the weather was below the minimum for VFR." (p. 932).

The court said there was no negligence on the part of the Tower Control Operators under the facts of that case. This Court believes that the dicta set forth in the reasoning of the court in that case are based on an insufficient consideration of all the Federal laws, rules and regulations, as demonstrated in this opinion, and that the duties of tower control operators are not limited to purely preventing physical collisions of aircraft and pure traffic control as between air traffic and other air traffic objects. If this were so, the administrator would have been in error both before and after the accident here involved, in telling control operators that they could and should take into consideration possible turbulence in clearing and landing aircraft.

On the other hand, even the Smerdon decision recognizes that "The case of Eastern Air Lines, Inc., v. Union Trust Co. [95 U.S.App.D.C. 189] 221 F.2d 62, is persuasive in determining that Congress has consented for the government to be sued for damages resulting from the negligence of its tower operators acting within the scope of their employment."

46. Martens v. United States, USDC SC Cal., 1957, 5 Aviation Cases 17,465, is not available to this Court, but from the government's own statement of the facts indicating that the law and regulations did not place any duty upon a tower controller to ascertain the type of flight license held by the pilot before giving him a clearance, obviously distinguishes that case from this.

47. Braniff Airways, Inc. v. United States, S.D.Fla.1961, 203 F.Supp. 602, is obviously inapplicable. There, the plane caught fire after it was in the air, apparently from a defective engine, and crashed. Under no rational basis could any negligence be imputed to tower personnel who only saw a glow after the fire started when the plane was two or three miles in the air and who could have done nothing to help. The quotation that the case comes within the exception found in Section 2680(a) of Title 28 U.S.C., is pure dictum.

48. In United States v. Miller (9 Cir. 1962) 303 F.2d 703, two actions against the United States, as the result of a midair collision of two privately owned light aircraft near Boeing Field, Seattle, in broad daylight, with perfect visibility and ideal weather conditions, were brought, one by the executrices of the estate of Miller, the pilot of one of the planes, who was killed by the accident, and the other by the owner of the plane and employer of Miller. No passenger was involved in this case. The lower court found the tower personnel negligent in eight different respects, including failure to maintain proper or any control over the two aircraft as to proper spacing in the traffic pattern, and found the pilot Miller not guilty of contributory negligence in failing to observe the other aircraft and avoid the accident. The appellate court *found it unnecessary to decide whether the trial court erred in its findings and conclusions as to negligence of the tower operators,* and found the pilot Miller guilty of contributory negligence in that under the applicable flight rules the other aircraft, the Cessna, approaching on his right, had the right of

way and he had failed to maintain a sufficient lookout to see the plane as he should have.

The court says at page 711:

"The optimum of safety is sought to be achieved by imposing *concurrent duties* on the pilots and tower personnel. In any given case, one, both, or neither could be guilty of a breach of the duties imposed. This view is implicit in the decision of the court in Eastern Air Lines v. Union Trust Co., 95 U.S.App.D.C. 189, 221 F.2d 62, affirmed, sub nom., United States v. Union Trust Co., 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796. The ultimate result reached in that case recognized that both the Government and the airline had concurrently breached their duties, and each was held liable."

49. United States v. Schultetus (5 Cir. 1960) 277 F.2d 322, 86 A.L.R.2d 375, although closer to the present case, is still distinguishable. It is to be noted first, that the suit was not brought by the student pilots' heirs (two student pilots were killed), but by the widow of Sen and Aero Enterprises, Inc. (the employer of Sen and owner of one of the planes) who sued American Flyers, Inc., owner of the other plane involved in the accident, and the United States.

This case involved a collision between a Cessna 170 and a Cessna 140, the former owned by American Flyers, Inc., a flying school (hereinafter called American) and piloted by instructor-pilot Schultetus and a student pilot, and the latter owned by Aero Enterprises, Inc., also a flying school (hereinafter called Aero) and operated by instructor-pilot Sen and a student pilot. All four occupants were killed, but apparently neither of the student pilots was involved in this case. Aero and Sen's widow for self and children sued American and United States, claiming the pilots of the 170 were negligent and that the U. S. was negligent in giving improper signals, and failing to give proper signals from the control tower. American cross-claimed for the value of its Cessna 170 against Aero

and the United States, alleging negligence, and also cross-claimed against the United States for indemnity. The United States cross-claimed against American for indemnity or contribution. Schultetus's widow for self and child sued Aero and the United States and Aero cross-claimed against the United States, which cross-claimed against Aero for indemnity and contribution. An insurance company intervened for workmen's compensation paid for Schultetus. The significant thing is that *this case decides nothing as to the liability of the United States under similar circumstances for the death of a student pilot who would not ordinarily,* as this Court sees it, *be held guilty of contributory negligence,* even if the instructor-pilot of his plane was. This alone possibly distinguishes the Schultetus case. However, we will discuss it in more detail.

The district court had held in Aero Enterprises, Inc. v. American Flyers, Inc., 167 F.Supp. 239 that there was no negligence in the operation of either aircraft but that the CAA employees were negligent in what they did and failed to do. The United States appealed. In reversing the judgment against the United States the court did not specifically reverse any of the findings as to lack of negligence of any of the operators of the two airplanes, but simply held that the court had erred in finding that the U. S. employees were negligent. The appellate court said that although the 170 was being operated by a student pilot under IFR rules, the instructor-pilot had full visibility and was operating in fact under VFR conditions. It was pointed out that tower clearances were permissive in nature and did not relieve a pilot from exercising a reasonable degree of caution in executing the provisions of a clearance; that the information given by the tower to the Cessna 170 as to the presence of the 140 in the traffic pattern culminating in its express warning "TRAFFIC CESSNA CROSSING IN FRONT OF YOU" was in full discharge of the responsibility of the tower to give information in preventing collision be-

**996**

tween aircraft. Also, it is to be noted that the Cessna 170 had the Cessna 140 in sight, or had said that it did, and hence the tower operators had no reason to believe that a collision between the two planes was imminent. It is true that the court in that case said (277 F.2d p. 327), "The theory followed by the district court would place upon the operators of control towers the primary responsibility for the operation of aircraft at the field. Governmental regulations, having the force of law, have assigned this responsibility to the operators of aircraft.", citing 49 U.S.C.A. §§ 551, and 560(a), both since repealed, and Section 1421 (presumably for its provision in paragraph (b) that, "In prescribing standards, rules, and regulations * * * the Administrator shall give full consideration to the duty resting upon air carriers to perform their services with the highest possible degree of safety in the public interest * * *"; it also cites Section 1430(a) (5) making it unlawful, "(5) For any person to operate aircraft in air commerce in violation of any other rule, regulation, or certificate of the Administrator under this subchapter; * * *". It also cites Allegheny Airlines v. Village of Cedarhurst, (2 Cir. 1956), 238 F.2d 812, (which simply holds that the federal laws and regulations concerning air traffic are constitutional and supersede regulations of villages over which the traffic passes).

The court found that the tower was under no duty under the circumstances to use its red general warning light to the Cessna 140, which was not radio-equipped, because it had good reason to believe that the 170 which had been warned, *and acknowledged seeing the 140*, would avoid it, "in the exercise of his direct and primary responsibility."

The court did say that "the district court has overlooked the principle that the direct and primary responsibility for the operation of aircraft over or in the vicinity of an airport rests upon the pilots of the aircraft," in holding that the tower operators were negligent in failing to control the separation of the aircraft.

It seems clear to this writer that in this case the real reason why the court reversed the judgment below *was in fact contributory negligence* on the part *of Schultetus insofar as he and his employer were concerned, and that the other pilot was also contributorily negligent, as neither of them apparently observed the other, although there had been due warning that they were in each other's traffic pattern.* The court also held that there was no obligation on the part of the tower personnel to warn the Cessna 140 with its red signal light to give way to the Cessna 170 because they had duly warned the 170, it had acknowledged seeing the 140, and they had a right to believe that the 170 would avoid the 140.

Incidentally the appellate court noted that by the time there might have been any thought of using a general warning signal light, the 140 had passed the tower and those in it would have had to look backward to have seen any signal, hence a warning would have been futile anyway. Finally, one might note that at least it was possible for each of the two Cessnas to see each other in broad daylight under ideal weather conditions and traveling at moderate speeds, whereas in the case of the Piper, the turbulence was invisible and not obvious to the naked eye.

50. New York Airways, Inc. v. U. S., (2 Cir. 1960) 283 F.2d 496 is also distinguishable. There the plaintiff's helicopter was engaged in a scheduled passenger and baggage service between Idlewild Airport and a designated gate at Newark Airport. The touchdown area at Newark was in a part of the field where service vehicles passed and repassed. On the flight in question the only occupants of the helicopter were the pilot and a flight attendant. After having radioed for, and received clearance to, land at a particular area, the pilot glided in on an angle which, because of a blind spot on the helicopter, of which he must obviously have been aware, prevented him from seeing a service truck

which was proceeding at a moderate speed in that area. The truck had no radio, so he had no instructions. The pilot landed on the truck, damaging the helicopter, whose owner thereupon sued the United States, on the ground that the Ground Controller was negligent in clearing the helicopter to land under the circumstances. The pilot had heard nothing from the control tower since getting the clearance to land and testified he did not see the truck until after the impact. However, if he had banked to the right rather than glided straight in, he could have noticed the truck. The court held that the pilot was not relieved from a duty to watch the landing area for passing vehicles and the Controller could not be expected to watch him at all times. The court cited the Flight Information Manual to the effect that a clearance was permissive and did not relieve the pilot from exercising a reasonable degree of caution in executing the provisions of the clearance, and said that the standard of a pilot's vigilance must be even higher than that with respect to collisions between aircraft where the anticipated danger is from ground vehicles, which, unlike aircraft, the Flight Controller cannot warn by radio. The plaintiff's operations manager admitted that he continuously instructed his pilots to survey the area where they were going to land to see that it was clear, in spite of any clearance that they might get from the tower, and to observe the landing area at all times. It seems clear to the writer that the touchdown area for this helicopter, unlike that for regular airplanes, was known by the helicopter owner and pilots to be one that was not necessarily cleared of all land vehicles whenever a helicopter was to land, so that the helicopter had no right to assume that all ground traffic was stopped and the area kept clear of vehicles whenever a clearance was given for it to land. The appellate court sustained the lower court in its holding that the plaintiff had failed to prove freedom from contributory negligence.

51. As this Court reads Eastern Airlines, Inc. v. Union Trust Company, and United States v. Union Trust Company, 95 U.S.App.D.C. 189, 221 F.2d 62 the case does not, as far as this Court can see from reading the opinion, hold as the government contends "that the duties of Government control towers to pilots are confined to the obligations imposed on the controllers by the manual containing air traffic control procedures." Actually, as the government concedes, the judgment against the government for negligence of the tower in granting clearance to two planes to land on the same runway at approximately the same time, was sustained. And furthermore, it was held that:

"The three negligent omissions and the one affirmative negligent act found by the court were not 'decisions responsibly made at a planning level' and did not involve any consideration important to the practicability of the Government's program of controlling air traffic at public airports. The tower operators acted, and failed to act, at an operational level. While they were in a sense exercising discretion as to what they should and should not do, they were not performing the sort of discretionary functions contemplated by § 2680(a) and clearly described in the Dalehite decision.

"It is therefore our opinion that, if a Government towerman negligently clears two planes to land on the same runway at the same time, or is guilty of some other negligent act or omission in doing his work, the Government is liable for resulting injury in the same manner and for the same reason that it is liable for injury done by the driver of a mail truck who, in exercising discretion as to how to drive, negligently runs through a red traffic light." (p. 78)

The Eastern Airlines decision, therefore, is one which fully supports this Court's ruling.

52. Johnson v. United States (E.D. Mich.1960) 183 F.Supp. 489, also holds that while the existence of many variables affect the creation, position, intensity and persistency of turbulence, and while the existence of these variables perhaps prevents the setting up of absolute limits for safe separation with respect to turbulence hazards, rough rules of thumb to determine such separation are available, and that:

"The fact that variables prevent the fixing of limits with certainty does not absolve the control tower from a duty to take the turbulence hazard into consideration, but this is merely one factor that may be considered in determining whether under a given set of facts the employees of the control tower did meet the standard of reasonable care." (p. 492)

This Court agrees with the Johnson decision that:

"In any event, the safety of those using air lanes is not to be sacrificed to traffic expediency.", (p. 493)

and that control tower employees in the exercise of reasonable care do have a duty to take into consideration turbulence hazards when giving clearance to take off, as well as to land. Although in that case the court found for the defendant United States on the basis of contributory negligence of the pilot of the plane, it nevertheless is authority for the position here taken and taken in that case as to the duties of tower controllers.

53. The Dalehite v. U. S. (1953) 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427, case also relied upon by the government, involved the question of liability of the United States for what had been done under applicable regulations and laws relating to the fertilizer program. The majority in that case held that every decision on the part of governmental personnel claimed to have been negligent was made at a high policy level and not in the field, hence the government was exonerated under the exception as to the discretionary functions set forth in 28 U.S.C. § 2680(a). Even this decision, however, is weakened by the fact that it was made by only seven justices, who divided four to three, with a vigorous dissent by the three nonconcurring justices, who felt that even under the circumstances of that case, the government should have been held liable.

54. Powell v. U. S. (10th Cir. 1956), 233 F.2d 851, Dupree v. U. S. (3rd Cir. 1957), 247 F.2d 819, and Builders Corp. of America v. U. S. (9 Cir. 1963), 320 F.2d 425, are obviously inapplicable to this case on their facts, as they do not deal in any way with airplane accidents, or the powers and duties of the F.A.A. The same can be said of Weinstein v. U. S. (3rd Cir. 1957), 244 F.2d 68.

55. The government's contention that the alleged negligence of the tower controllers, even if they were negligent, was not the proximate cause of the accident, but rather an alleged intervening cause—namely the negligence of the pilot Shima, is rejected. As this Court has held, the basic negligence on the part of defendant Baker was in failing to furnish to Furumizo, to whom it owed the highest degree of care, an adequately trained and informed instructor pilot having a full realization of the extent of the danger to planes of the size of the Piper, of turbulence in situations where such small plane would cross at an acute angle an intersecting runway on which the turbulence had been created, almost immediately after the turbulence was created.

56. In its attempt to exonerate the control tower operators and thereby exonerate the government, reliance is placed by the government upon alleged compliance by its employees (FAA employees, the control tower operators) with procedures prescribed by the Administrator of the FAA. This will next be examined in detail.

57. As the overall statutory authority for the functions of controlling air traffic, the government, as well as other parties, cites the basic provisions of 49

U.S.C.A. § 1348, reading in part as follows:

"Airspace control and facilities— Use of airspace

(a) The Administrator is authorized and *directed to* develop plans for and formulate policy with respect to the use of the navigable airspace; and *assign by rule, regulation, or order* the use of the navigable airspace under such terms, conditions, and limitations as he may deem necessary *in order to insure the safety* of aircraft and the efficient utilization of such airspace. He may modify or revoke such assignment when required in the public interest.

"Air navigation facilities

(b) The Administrator is authorized, within the limits of available appropriations made by the Congress, (1) to acquire, establish, and improve air-navigation facilities wherever necessary; (2) to operate and maintain such air-navigation facilities; * * * and (4) to provide necessary facilities and personnel for the regulation and *protection* of air traffic.

"Air traffic rules

(c) The Administrator is further authorized and directed to *prescribe air traffic rules and regulations* governing the flight of aircraft, for the navigation, *protection*, and identification of aircraft, for the protection of persons and property on the ground, and for the efficient utilization of the navigable airspace, including rules as to safe altitudes of flight and rules for the prevention of collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects.

"Applicability of Administrative Procedure Act

(d) *In the exercise of the rule-making authority under subsections (a) and (c) of this section, the Administrator shall be subject to the provisions of the Administrative Procedure Act,* notwithstanding any exception relating to military or naval functions in section 1003 of Title 5."

■ 58. The accident in question occurred on 19 June 1961. At that time there were in effect *Civil Air Regulations* adopted by the Federal Aviation Agency *including Air Traffic Rules.* These are set forth in *Exhibit G–1* constituting *Part 60 Civil Air Regulations in effect June 20, 1961.* For aught that appears, these regulations had been in effect for some years prior to 1961 and thereafter insofar as provisions relevant to this case are concerned. In addition to promulgating such *Air Traffic Regulations* which have been duly *adopted in accordance with the Administrative Procedure Act, pursuant to Section 1348(d),* the Administrator has also issued *Air Traffic Control Procedures* for the use of its employees, the controllers. These *Procedures,* as stated in the memorandum filed by the defendant after trial on May 6, 1964 (which have been carefully studied) *were contained in the ATM–2–A Manual at the time of the accident* (Ex. G–5). Whatever may be the effect of these *Air Traffic Control Procedures,* they are obviously *not adopted in accordance with 49 U.S.C.A. § 1348(d),* but as stated in the foreword in Exhibit G–5:

"This manual prescribes procedures, with accompanying phraseology, to be used by personnel of all facilities providing Air Traffic Control service and is one of the Air Traffic Control Manuals of the Federal Aviation Agency referred to in Part 26 of the Civil Air Regulations.";

therefore, as this Court sees it, they do not have the force and effect of law as do the regulations. We now proceed to consider these Air Traffic Control Procedures.

59. Section 100.1 of the Air Traffic Control Procedures provides:

"Except where special procedures are set forth in Operations Letters

or Letters of Agreement which supplement those herein, personnel engaged in the provision of air traffic control service shall provide such service *in accordance with the procedures and minima* contained in this manual."

60. Section 100.7 provides:

"While every effort has been made to prescribe complete procedures and phraseology, *it is manifestly impossible to provide them to cover every circumstance. Therefore, when situations arise which are not provided for herein, personnel are expected to use their best judgment, both as to the procedure employed and the phraseology in which it is expressed.*"

61. In definitions under Section 120 of the Manual (Ex. G-5):

(a) Air Traffic Clearance is defined as:

"Authorization by air traffic control facilities, for the purpose of preventing collision between known aircraft, for an aircraft to proceed under specified traffic conditions within controlled airspace."

(b) Air Traffic Control Service is defined as:

"A service provided for the purpose of promoting the *safe,* orderly and expeditious flow of air traffic, including airport, approach and en route air traffic control services."

(c) "Separation" is defined in Section 120, ATM-2-A, 1–5, as:

"Spacing of aircraft to achieve their *safe* and orderly movement in flight and while landing and taking off."

(d) "Separation minima" are defined in the same manual as:

"The *minimum* longitudinal, lateral, or vertical distances by which aircraft are spaced through the application of air traffic control procedures."

(e) Section 400.1 of the ATM-2-A provides:

"Airport traffic control towers shall provide airport traffic control service, and in so doing shall issue and relay such clearances and information as will facilitate use of airports by aircraft."

(f) Section 411.1 provides:

"Clearances, instructions and information issued by airport traffic controllers *shall be predicated solely upon observed or known traffic or airport conditions which, in their judgment, may constitute collision hazards to aircraft.* This may include the positions of aircraft in flight within the control zone or operating on the movement area, and observed or known vehicular traffic and temporary obstructions on or immediately adjacent to said area."

(g) Section 411.2 provides:

"*Except as set forth in 205 A and B and 411.4,[8] denial of clearance for an aircraft to land or take off shall be based solely on considerations of traffic.*"

(h) Section 411.3 provides:

"Whenever practicable, an alternative clearance or instruction may be issued to a pilot who so requests."

(i) Section 411.7 provides:

"*When controllers foresee the possibility that departing or arriving aircraft might encounter rotorcraft downwash, thrust stream turbulence or wing tip vortices from preceding aircraft, cautionary information to this effect should be issued to pilots concerned.*

"NOTE.—Since the existence and effect of turbulence is unpredictable, the provision of the above information does not constitute the placing of responsibility on controllers to anticipate in all cases the need for such information."

---

8. Section 411.4 covers non-clearance to land or take off from a "closed" runway.

(j) The following sections of the Manual relate to separation of aircraft, clearances, and definitions:

"420 Separation

Separation of aircraft landing and taking off shall be governed by the procedures and minima set forth below.

"421 Procedures: * * *

"421.1 *Separation* shall be effected by establishing the sequence of arriving and departing aircraft and *advising pilots thereof to make such* adjustments in flight or ground operation as may be necessary to accomplish the desired spacing between aircraft in accordance with the *minima* in 422 or 423. Where control tower siting precludes accurate determination of the separation existing between actual or projected flight or ground paths of aircraft, caution shall be exercised to avoid issuance of clearances or instructions which may increase the potential of traffic confliction.

> "NOTE.—Procedures for control of aircraft on and in the vicinity of airports are established on the basis that *pilots of aircraft are in no way relieved of their responsibility to comply with the Civil Air Regulations or any other pertinent regulation.*"

* * * * * *

"422 Minima

Except as provided in 423, separation between aircraft which are using the same runway shall be effected in accordance with the *minima* set forth below."

* * * * * *

"422.2 Between departing aircraft, *sufficient* separation so that:
THE PRECEDING AIRCRAFT HAS EITHER CROSSED THE OPPOSITE END OF THE RUNWAY OR TURNED AWAY FROM THE PROJECTED PATH OF THE SUC-CEEDING AIRCRAFT BEFORE THE LATTER BEGINS TAKE-OFF RUN."

* * * * * *

"431.4 Take-off clearance should *normally* be issued after the aircraft has taxied to *the end of the runway-in-use or* the *run-up area adjacent thereto.*

"431.5 Separation of departing aircraft shall be in accordance with the *minima* in 420. However, a controller may issue a take-off clearance to the next succeeding aircraft before the separation specified in 420 exists if, in his judgment, such separation will exist when the departing aircraft begins take-off run."

* * * * * *

"439.1 Phraseology in accordance with the following shall be utilized when it is desired to:"

* * * * * *

"D. Require an aircraft to hold at a specific point or to indicate that take-off clearance cannot be issued immediately:
1. HOLD,
2. HOLD SHORT OF (position),
3. HOLD ON (taxi strip, run-up pad, etc.), or
4. HOLD FOR (reason);"

* * * * * *

"J. Issue approval for an aircraft to taxi into take-off position on runway when take-off clearance is withheld:
TAXI INTO POSITION AND HOLD:

"K. Issue take-off clearance;
CLEARED FOR TAKE-OFF;

"L. Issue take-off clearance when it is necessary that the take-off be accomplished without delay due to traffic on final approach:
CLEARED FOR IMMEDIATE TAKE-OFF;"

* * * * * *

"Q. Issue cautionary information regarding possible rotorcraft down-

**1002**

wash, thrust stream turbulence and/or wing tip vortices:

"CAUTION, TURBULENCE (traffic information);

Example:

CAUTION, TURBULENCE, DEPARTING AMERICAN ELECTRA."

Other relevant sections of the Manual provide:

"450 PREVENTIVE CONTROL SERVICE

NOTE.—Preventive control service differs from other airport traffic control service in that repetitious, routine approval of pilot action is eliminated, requiring that controllers intervene only *when they observe traffic conflictions developing.*

"451 General

"451.1 Procedures employed in preventive control service shall be in accordance with the terms of an Operations Letter entered into with local groups such as civilian flying schools, fixed-base operators, military flying schools or military aviation activities and shall be limited to members of said groups.

"451.2 Except where otherwise covered in the Operations Letter, clearance shall be issued for initial takeoff.

"451.3 Controllers shall issue appropriate advice and/or instructions when, *in the judgment of the controller, inadequate spacing will exist between aircraft or other situations develop which require corrective action.*"

62. 49 U.S.C.A. § 1430 provides:
"(a) It shall be unlawful—

"(1) For any person to operate in air commerce any civil aircraft for which there is not currently in effect an airworthiness certificate, or in violation of the terms of any such certificate;

"(2) For any person to serve in any capacity as an airman in connection with any civil aircraft, air-craft engine, propeller or appliance used or intended for use, in air commerce without an airman certificate authorizing him to serve in such capacity, or in violation of any term, condition, or limitation thereof, or in violation of any order, rule, or regulation issued under this subchapter;

\* \* \* \* \* \*

"(5) For any person to operate aircraft in air commerce in violation of any other rule, regulation, or certificate of the Administrator under this subchapter; and".

63. 14 C.F.R., Section 26.26, as revised January 1, 1961, provides:

"A certificated air traffic control tower operator shall control traffic in accordance with the procedures and practices as prescribed in the appropriate air traffic control manuals of the Federal Aviation Agency to provide for the *safe,* orderly and expeditious flow of air traffic in accordance with the following requirements:"

■ 64. In the light of the foregoing regulations and directives, the Government contends that its controllers did everything that they were required to do, precisely in line with regulations and directives, and hence, could not have been negligent. However, this Court finds that the regulations and directives did not leave the tower controllers devoid of any duty to exercise judgment in the interests of *safety* where, in a situation like this, they knew, or should have known, that a light Piper taking off at the time and in the manner and under the circumstances of this particular case must almost certainly encounter air turbulence of a degree so severe as to be imminently dangerous to the occupant or occupants of the light plane, which might well include an unskilled student pilot whose life depended upon the exercise of due care by both his instructor pilot and the tower control operator. That these regulations *did contemplate, permit and authorize the exercise of discretion and judgment*

*on the part of tower control operators to lengthen separation if the danger of air turbulence appeared imminent, is proved by the acts and publications of the F.A.A. hereinafter discussed.*

65. As early in 1954 the Douglas Aircraft Company issued a report by Zegmund O. Bleviss, referred to throughout the trial as the Bleviss Report, which set forth experiments and research as to the trailing vortex system created by airplanes, particularly large airplanes, and the effect thereof on light airplanes which encountered such vortices. The Report summarizes the results by saying that:

"Because of the many factors involved, and because much of the required data would not be known in any typical situation, no detailed rules can be set up which will allow pilots of light planes to avoid difficulties under all conditions. However, certain rough rules-of-thumb, concerning separation times necessary to assure safe 'conditions' are formulated for the numerical example (see figure 25). For a large airplane which differ greatly from the DC6–B, a method for rapidly estimating the corresponding rules-of-thumb is given." (Exhibit P–38, Summary)

Then follow on pages 39 to 40 conclusions which give these rules-of-thumb. The effect of this report and of other reports prior to 1961 indicating the tremendous hazard to light planes of these trailing vortices of the large airplanes was such as to cause the FAA or its predecessor agency to issue warnings prior to 1961 concerning such wake vortices. For example, Government's Exhibit G–4, for identification, and Plaintiff's Exhibit P–36, Safety Bulletin No. 187–53, emphasize such hazards.

66. The Plaintiff, in order to show that the government knew or should have known of the dangers of trailing vortices of large airplanes, and the government, in order to show that pilots generally should be deemed to have known about such dangers, introduced various publications which are here considered in chronological order so far as disclosed by their respective dates.

a. Exhibit G–2, excerpts from "Facts of Flight," published March, 1947, containing practical information about operation of private aircraft, put out by the Civil Aeronautics Administration for information of pilots, states on page 11 thereof as follows:

"A word of warning is advisable concerning landing or take-off behind high-powered aircraft—particularly two- and four-engine transports. The turbulence created by the propellers may extend to the rear for a mile or more, and will affect a light airplane in much the same way as violent gusts."

b. Exhibit G–12, circular letter, March 3, 1952, is a circular letter to All Regional Administrators from Chief, Airways Operations Division of the Civil Aeronautics Administration on the subject of "Effect of Large-Plane 'Turbulence' on Small Aircraft." This circular indicates knowledge on the part of the Administration that:

"* * * Under certain conditions, small aircraft have encountered turbulence of such severity as to cause total or partial loss of control.",

when closely following large multi-engine aircraft in the traffic pattern or landing behind such aircraft. It asks all facility personnel who have observed or experienced severe buffeting when small aircraft are following large multi-engine aircraft in the pattern or on approach to submit brief reports as to details. It adds:

"Our discussions so far do not indicate that any change in control procedures will be necessary as a result of these studies, but it is apparent that a need may exist for a pilot educational program. * * *"

c. Exhibit G–13, dated August 28, 1952, is another circular letter on effect of large-plane turbulence on other aircraft, referring to Exhibit G–12. This

indicates that the information sought by G–12 showed that there were *numerous incidents of turbulence encountered by small aircraft "on the ground* or in flight where *following or crossing* the thrust streams of multi-engine or jet type aircraft." Reference is also made to a *crash of a light aircraft departing in the wake of a large multi-engine aircraft.* While the Department stated that the separation *minima* were legal, and while the controller did advise pilots of light aircraft to be on the alert for turbulence, it nevertheless remarked:

> *"This incident, and the many others reported, have not changed our thinking concerning the adequacy of our present separation standards, but have exemplified the fact that control personnel should constantly be alert to situations which, if properly recognized and acted upon, may result in the savings of life and property.* \* \* \*

> "The results of this survey, therefore, present an excellent object lesson for all tower personnel whereby, *through the use of individual initiative and good judgment, recurrence of these types of incidents may be prevented."*

Exhibit G–13 cancels Exhibit G–12.

d. Exhibit P–23 is circular letter dated February 24, 1953, on "Effect of Large-Plane Turbulence on Small Aircraft; Circular Letter W–380–105 Dated March 3, 1952, and W–380–213 Dated August 28, 1952." The references are to Exhibits G–12 and G–13. This circular letter publishes a pamphlet published by the Beech Aircraft Corporation titled "Big Plane Turbulence Can Cause A Flight Hazard," and goes on to say:

> "Because of its value to air traffic control operations, a limited supply of this publication has been obtained and *distribution of one each to all facilities has been made."*

This pamphlet relates numerous instances of accidents or near accidents caused by turbulence produced by large planes and ends up with recommendations reading as follows:

> "Recommendations:

> "1. Allow plenty of space between aircraft in the traffic pattern.

> "2. Make your approach to and landing on the up-wind side of the runway.

> "3. Maintain adequate flying speed well above your aircraft's stalling speed, when entering an area just vacated by another airplane.

> "4. Be alert and prepared for turbulence on your landing approach.

> "Editor's Note: We wish to thank not only the writers of the letters quoted herein, but also the writers of the over 200 other letters which covered the same subject and which could not be quoted for lack of space. The letters herein were selected for their variety in order to cover the field as thoroughly as possible in a bulletin of this type."

e. Exhibit P–36 is a safety bulletin stipulated to have been issued by the Federal Aviation Agency in 1953. This emphasizes again the grave danger of turbulence caused by big aircraft. At one place it says:

> "This problem has been recognized almost since the birth of powered flight, but a number of recent fatal crashes have brought it into focus."

Instances of fatal crashes are enumerated, and advice is given to pilots to keep their distance, etc., and the bulletin points out that, "Waiting an extra minute won't cost much and it can save your neck!"

f. Then comes the Bleviss Report, Exhibit P–38, dated December, 1954, already discussed ante, paragraph 65. That the government was fully familiar with this report prior to June, 1961, is clear from the evidence.

g. Exhibit P–24 is circular letter of February 17, 1955. It relates to "Effect of Thrust Stream 'Turbulence' on Other Aircraft." In this circular, reference is

made to the survey of March, 1952, mentioned in Exhibits G–12 and G–13, with the remark that:

"The results of this survey indicated that our current separation standards are adequate. In addition, the survey *emphasized* that *control personnel must be constantly alert to detect situations which, if not promptly recognized and acted upon, could lead to the development of hazardous situations and possible destruction to life and property.* * *

"*Under conditions of the type referred to above, and in any other conditions where it is anticipated that turbulence could exist, it is preferable that aircraft be delayed until it can be reasonably assumed that a hazardous situation no longer exists.* Lack of radio communication should not preclude the issuance of warning information to pilots since adequate light signal procedures exist for this purpose. *Failure to recognize these potential hazards and to act accordingly can reflect on the judgment and efficiency of our facilities and defeats the purpose for which air traffic control services are established.*"

h. Exhibit G–3 is December, 1955, revision of "Facts of Flight" similar to G–2. It states on page III in the introductory note, that it is the third of a series of short manuals prepared by the examinations branch of the Civil Aeronautics Administration to provide the private pilot with information essential to the safe operation of his aircraft. Page 11 contains the same quotation as above set forth from Exhibit G–2 concerning danger of turbulence. It seems to be substantially identical with G–2.

i. Exhibit P–15, Aviation Safety Release No. 399, dated December 19, 1955, states its subject as "Hazards to Small Aircraft Flown in the Wake of Large or Heavy Jet and Propeller Driven Aircraft." It states:

"*Recent serious accidents and critical flight incidents have emphasized*

the *hazards associated with the flight of small airplanes behind or in close proximity to large or high performance aircraft.* The term 'small aircraft' used in this discussion is intended to include all civil aircraft smaller than those certificated for air transport use, including those commonly used for business transportation.

"The conclusions which follow are drawn from technical material published or made available by the following:

* * * Beech Aircraft Corporation * * *

Douglas Aircraft Company * * *".

Wing tip vortices are illustrated in the pamphlet. Among other things, the pamphlet states,

"*WING TIP VORTICES* formed in the wake of a large airplane are illustrated in Figure 1. These vortices have been identified as the *greatest potential hazard, except actual collisions, to small aircraft flown in the vicinity of large airplanes.* Adverse wing tip vortices also can be generated by relatively small heavy aircraft, such as jet fighters."

And below the illustration, the following:

"Pilots should consider the following facts about these vortices:

"1. *Severe vortex turbulence* has a *duration of from 30 to 60 seconds* (1 to 3 miles) after the passage of the large airplane which caused it, and may persist much longer under favorable conditions.

"2. The *roll effect of a trailing vortex* from a large airplane, either propeller driven or jet, *can exceed the aileron controllability of a small airplane flying parallel to it.*"

Other dangers are pointed out in this publication, which ends up with the following CAA recommendation:

"1. Pilots of small aircraft should be alert to observe and avoid the

flight paths of jet aircraft. The time available for evasive action after a jet is first spotted is amazingly short.

"2. Pilots of small aircraft should avoid following large transport-type aircraft, especially on landing approaches in calm air. Violent rolling tendencies which may become uncontrollable, and sudden losses of altitude and/or airspeed are possible in trailing vortices behind large aircraft, especially when they are at low airspeed.

"3. Pilots should avoid crossing behind other aircraft, especially those flown at low speed. If trailing vortices are encountered, abrupt evasive maneuvering or violent pull-ups at high speeds can add materially to the structural load imposed by the gusts experienced.

"4. There is little significant difference between the wakes of large propeller driven airplanes and those of large jet airplanes. The area aft of and just below the flight paths of both should be avoided."

j. Exhibit G–14 circular letter dated June 7, 1956, with cross-reference to Exhibit P–24, a previous circular letter, is on the subject of "Effect of Thrust Stream 'Turbulence' on Other Aircraft," W–380–551 dated February 17, 1955, and states:

"We continue to receive reports of incidents involving aircraft caught in thrust stream turbulence from large aircraft. Typical of the incidents being reported is the example contained in the reference ARLET.

"While it is realized that considerable publicity has been given this subject, *it is still necessary that controllers be constantly on the alert to detect situations which could develop into hazardous conditions. We believe it necessary for all control tower personnel to review the reference ARLET and to expend a further effort to reduce the frequency of these incidents through issuance*

*of appropriate advisory information."*

k. Exhibit P–26, circular letter dated October 27, 1958, on the subject of "Effect of Thrust Stream 'Turbulence' On Other Aircraft" states:

"Several years ago, this office conducted a study of the extent to which aircraft encounter turbulence on the ground or in flight when following or crossing behind multiengine and jet type aircraft. More recently current events have caused us to review the decision resulting from that study. The instances in which such turbulence contributes a hazard to operation of an aircraft occur very infrequently. This would indicate that pilots and controllers are suitably vigilant to this problem *obviating the need for considering it as a factor in development of separation standards.*

"Control personnel have by now become quite familiar with most of the situations wherein thrust stream turbulence reaches significant proportions. * * * "

Then follows an account of unusual turbulence situation resulting in a near accident with the comment:

" * * * *In retrospect, it may have been advisable, depending upon circumstances, for the controller to have instructed the Cessna to execute a level turn away from the path of the other aircraft and thereafter go around, once it became apparent that response was not forthcoming from the Constellation. It is sometimes expedient to disregard right-of-way and control the aircraft which is controllable rather than the one which should give way.*

"*Control personnel should continue to be alert to the possible hazards from thrust stream turbulence which may be anticipated, and to aid pilots through issuance of warning information coupled with lengthened separation wherever thought advisable.*"

This circular also cancels previous circulars, Exhibits P–24 and G–14.

1.  Then comes Exhibit G–15, dated December 29, 1959, wherein the government, *after having admitted, in effect, by the preceding publications and directives to its tower personnel and the public generally, that under then existing laws and published regulations having the force and effect of law* (14 C.F.R., Sec. 26.26 supra) emphasizing *safety* equally with traffic control, *there is responsibility and discretionary power in controllers to lengthen separation and take action in addition* to the minimal separation standards, cancels circular letter of October 27, 1958, Exhibit P–26, and states, among other things: (on the question as to whether separation standards should be revised when thrust stream turbulence or wing tip vortices are anticipated)

"INFORMATION AVAILABLE TO THIS OFFICE indicated that severe vortex turbulence has a duration of from 30 to 60 seconds after the passage of the large aircraft which caused it, and may persist much longer under certain conditions. As many factors, such as weather conditions, type, configuration and speed of aircraft, affect the severity of turbulence and the length of time turbulence continues to exist, it is impractical to develop *criteria for increased separation standards.*

"Furthermore, we believe it is the pilots' responsibility to be familiar with not only the effect of all types of turbulence on aircraft, but also the various pilot techniques that can be employed when turbulence is encountered or is suspected to exist."

\*  \*  \*  \*  \*  \*

"*We feel present separation standards as defined in Section 3 of the ANC/PCAT Manual are adequate.* Also, due to the sometimes unpredictable nature of the occurrences of thrust stream turbulence and wing tip vortices, such turbulence cannot always be anticipated. *However, as an advisory service to pilots, con-*trollers should caution them of the possibility of encountering turbulence when it is foreseen.*

"For example:

"N1234 CAUTION, TURBULENCE, BOEING 707 DEPARTING RUNWAY 36. CLEARED FOR TAKE-OFF.

"*The provision of the above service is not to be construed to place a responsibility on the controller to anticipate its need in all cases.*

"*In addition to providing an advisory service, controllers should also be alert to the possibility of unexpected pilot actions when turbulence is encountered.*"

Thus, for the first time, possibly due to previous lawsuits against the government claiming negligence on the part of tower control operators, the aviation authorities appear to attempt to protect controllers from negligence as to the obligatory safety factor, by disavowing any responsibility whatsoever, except for possible cautionary warnings, without additional action such as longer separation, etc., even when the same might be certainly or well calculated to prevent reasonably anticipatable disaster to small planes from trailing vortices, as in this case. It is to be noted that *all this is done with no changes in the basic provisions of the statutes and regulations having the force of law, that existed when the previous directives and instructions were issued acknowledging some power and responsibility on the part of tower controllers to protect life and property by more action than the minima prescribed or directed by the Administrator.*

m.  Exhibit G–11 dated December, 1959, is an article introduced by the government from a publication called "The Aopa Pilot," which relates a fatal accident encountered in mid-air, considered to have been due to encountering trailing vortices, together with scientific discussion of the dangers of such vortices, with suggestions as to avoidance of such danger, setting forth the CAB

safety suggestions. The article ends up by saying,

"* * * When taking off behind a large aircraft on takeoff, lift your plane off well to the rear of the big plane's lift-off position and stay well above its path of climb." [9]

n. Exhibit P–19 dated 8/26/60 is Civil Air Regulations Draft Release No. 60–1 which, however, contains on the front page thereof a boxed-in informatory note reading as follows:

"CAR Draft Release #60–1. These definitions of Air Traffic Control instructions and clearances were never adopted as part of CAR–60. Page 3 indicates the Agency's feeling of distinction which must be made between the two terms 'instructions' and 'clearances.'"

If the government relies upon this exhibit as purported proof that air traffic control clearances are mere authorizations and not mandatory instructions that under existing regulations and practices all pilots should have known it, the Court finds that this is not so. For instance, the same release contains on page 6 thereof the following admission:

"Since this amendment is a clarification and restatement of the *existing regulatory situation*, it could be adopted without notice and opportunity for comments. However, since the *present practice may have misled some pilots as to the obligatory nature* [10] *of an air traffic control instruction*, the Agency is pub-

lishing this amendment as a proposal for comment, so that all pilots may be informed, and to provide them an opportunity to submit any comments they may care to make concerning it."

This admission was published ten months before the accident, but the proposed amendment was never adopted. Moreover, the entire document makes it clear that the Federal Aviation Agency itself recognizes that, even in relation to air traffic control clearances, there can sometimes be instances where the controllers must issue mandatory "instructions."

o. Exhibit P–18, issued January 4, 1961, is ATM Circular No. 35, which relates to the "Use of Intersection Take-Off by General Aviation Type Aircraft." It has been stipulated that this directive was never placed in effect at the Honolulu airport prior to the accident. It is significant to note the admission, on page 1 of this exhibit, reading as follows:

"Current provisions of the ATM–2–A Manual *do not specifically prohibit* controller initiation of taxi clearances which would provide for a take-off being commenced from other than the end of a runway. *They imply, however, that taxi clearances issued to departing aircraft should refer to the downwind end of the runway in use. Present practice in this regard is to clear all departing aircraft to the end of the runway to be used but to approve*

---

9. Apparently the government introduced evidence of this type to show that qualified pilots generally, through such pilot and official publications, know all there is to know about the dangers of vortices. It seems fair to say that this presumption should be equally applicable and the information even more certainly shown to have been available to tower controllers through the main office, which, as shown by the evidence, is supposedly conducting continuing research into aircraft safety.

10. This confirms the testimony of the expert pilot witness Carter, who had been manager of Baker's Air School at the time of the accident, who testified that

Furumizo, at least, was probably not aware of a pilot's right to refuse a take-off clearance—that the subject was probably not covered by the school at the time of the accident. If this is so, then it is a fair inference that if a flying school was not so fully aware of this as to require instruction in it, then it was not fully understood to be so by other pilots, including Shima, trained at the same school. In this connection, the Court notes that government witness Kay who testified to the contrary, was obviously testifying from what he considered his previous standard procedure, and not really from actual knowledge or recollection of the facts.

*pilot requests for take-off from a point other than the end of the runway."*

Procedure is thereupon prescribed for establishing approved intersection take-off points with no less than certain minimum takeoff runway lengths where this would, among other things, serve to *"safely* expedite airport traffic." This procedure admittedly was not used at the time the accident occurred and no reason is offered by the government as to why such procedure, made available five months before the accident, for establishing *safer* intersectional takeoff minimum distances was not used. The Court agrees with the contention of plaintiffs and defendant Baker that, at the time of the accident, neither the applicable laws and rules nor any regulations or directives of the aviation authorities of the government prescribed any separation standards for runways that intersected. The testimony of tower personnel attempting to sustain the government's contention that Part 422 of the existing regulations (Exhibit G–5) *did* prescribe specific minima for separation of aircraft at *intersecting runways,* is so labored and far-fetched as to reflect seriously upon their candidness. These cited regulations obviously refer only to the separation of aircraft upon the *same* runway. The government testimony and contentions that where two runways intersect, that makes them both the same runway within the purview of these provisions, because they intersect at a small common point or area, is patently absurd, especially in the face of illustrations clearly aimed at a single runway. Hence separation of aircraft in the case of intersecting runways was clearly left to the discretion and judgment of the tower controller. However, as demonstrated in this opinion, even if the claimed separation minima were applicable to intersectional takeoffs, they did not exonerate tower personnel from the authority and duty to exercise good judgment where it was obviously required in the interests of safety.

p. Exhibit P–16–A is an excerpt from Air Traffic Control Procedures, Sections 430–439.1, effective 5/1/61. This relates to taxi information to departing aircraft, setting forth the necessary information and instructions to be given. Section 431.4 states that:

"Take-off clearance should *normally* be issued *after the aircraft has taxied to the end of the runway in use or the run-up area adjacent thereto."*

Section 431.5, while prescribing the *minima* of Section 420 in separation of departing aircraft, gives a controller a discretion to issue a takeoff clearance to the next succeeding aircraft before the separation specified in 420 exists, if, in his judgment, such separation will exist when the departing aircraft begins takeoff run.

q. Exhibits G–1 and G–6 are respectively Part 60, Civil Air Regulations in effect on June 20, 1961, the day after the accident, and presumably on the day of the accident, and Flight Information Manual with corrections up to June 20, 1961. Various references are made by the parties to these two documents but they will not be considered minutely here, relevant portions thereof being elsewhere cited in this decision.

r. Exhibit G–5 is Air Traffic Control Procedures, referred to as ATM–2–A, dated November 1, 1960, with corrections as of June 20, 1961. It is also referred to as the Air Traffic Management Manual, or the "ATM" Manual. This too is copiously referred to in the testimony and arguments and is discussed elsewhere in this decision.

s. All other of the exhibits hereinafter discussed are dated after the date of the accident, and there is some question as to their admissibility, although the Court admitted them, with the exception of Exhibit G–7 for identification, which was denied admission. Had the latter been admitted, however, it would not have changed this Court's findings and conclusions. As to the admitted exhibits which post-date the accident of June 19, 1961, their effect on this Court's

Conclusions is only to the extent expressly stated in this decision.

t. Exhibit P–16–B is the 9/1/61 revision of Section 430 et seq. of the Air Traffic Control Procedures, superseding Exhibit P–16–A. Sections 431.4 and 431.5 are identical with those in Exhibit P–16–A.

u. Exhibit P–16–C is a revision of Exhibits P–16–A and B, and for the first time, under date of 3/1/62 the ambiguity mentioned in Exhibit P–18 is corrected by making it clear that only where designated intersecting takeoff points have been established may controllers initiate taxi authorization to pilots of single and twin-engine aircraft of less than 12,500 pounds to provide for takeoff from said points. There is then a cautionary note under Section 431.2 to the effect that:

> "Issuance of taxi authorization to a designated intersection does not deny a pilot's right to request and receive authorization to use the entire length of a runway or other than a designated intersection."

Note 2 refers to instructions governing establishment of designated intersection takeoff points contained in Manual ATS–1–A.

v. Exhibit P–16–D is a revision of Exhibit P–16–C as of 6/5/62. Its Section 431.2 appears identical with the same numbered section of P–16–C and its Section 431.9 is identical with Section 431.8 of P–16–C regarding separation of departing aircraft, but it adds an extra provision in the new section 431.8, that:

> "Whenever authorization is issued for an aircraft to taxi into take-off position on a runway and take-off clearance is withheld, traffic information shall be issued to indicate to the pilot the reason for holding."

w. Section 431.9 of Exhibit P–16–E dated 7/1/62 is identical with Section 431.7 of P–16–D regarding normal takeoff clearance after the plane has taxied to end of runway in use, or run-up area adjacent thereto. Other corresponding sections, although not numbered the same, are similar to the preceding exhibit.

x. Exhibit P–39 (objected to by government because it came after the accident date of June 19, 1961) is an ATS Bulletin of November 15, 1962, which discusses trailing wingtip vortices and mentions the various previous studies, including the Douglas Aircraft Corporation and Beech Aircraft Corporation studies (page 2). This publication significantly again recognizes that while the controller cannot make the pilot fly his plane in a perfect manner to avoid the dangers of turbulence,

> "You CAN, however, recognize that we can and should help the pilot avoid the hazards of this phenomenon.

> "You CAN use discretion when providing radar vectoring to light aircraft within a control area in which heavy aircraft or whirly-birds are operating.

> "You CAN 'talk it up' when you meet some of the light plane pilots in the coffee shop. It is possible that they all might not be aware of the severity in wingtip vortices or the fact that it can last for several minutes in calm air.

> *"You CAN avoid clearing a light plane for immediate takeoff behind a large aircraft, even though it will mean delaying traffic slightly."*

> \* \* \* \* \* \*

> "Common sense application of this information by controllers to air traffic control situations is another way in which you can help save lives." \* \* \*

67. Here again, it is to be noted: (1) that the last quoted circular letter was issued *WITHOUT ANY CHANGE IN THE EXISTING LAWS AND PUBLISHED REGULATIONS*, nor is this or any other circular, directive or regulation an unequivocal statement or determination that controllers *cannot, or should not*, in a given unduly perilous situation, *exceed the minima* prescribed. Moreover, the separation standards are

carefully denominated in the A.T.M. Manual as "Separation *Minima*." The very connotation of the term *"minima"* indicates that these are what they purport to be—*"minima"* and not *maxima*. In other words, the only meaning this Court can attribute to these separation standards from their obvious connotation, is that the controllers must allow *not less than* the minima, but that there is no prohibition on *exceeding the minima*.[11] Therefore, if under the *same laws and published regulations having the effect of law and equally emphasizing safety with traffic control*, controllers had *power and the duty to exercise discretion and judgment in avoiding situations of obvious danger, this power and duty*, as this Court sees it, *still continued, notwithstanding Circular Letter of December 29, 1959*, Exhibit G–15 and the language therein contained.

68. In the light of the foregoing, we have a situation here where there is no specific standard set forth in the regulations for separation of planes on intersecting runways, leaving such separation, therefore, to the judgment and discretion of the controllers; where the government controllers know or should know that many pilots do not yet understand fully that a clearance is a mere authorization and not a command, and that many pilots, because of being unsure of their alleged right to refuse to accept a clearance, are likely to follow such clearance forthwith; where, in this case, seven apparently mandatory instructions in close succession were given to the Piper's pilots, namely (referring to the numbered tower transmissions from Exhibit P–5 quoted ante, in paragraphs 19 to 24 inclusive of this decision):—

Transmissions: *No. 4*, to "CONTINUE DOWNWIND"; *No. 8*, to "FOLLOW THE DC THREE * *"; *No. 11*, to "CONTINUE APPROACH NOW FOR FOUR LEFT"; *No. 14*, to "CONTINUE APPROACH NOW FOR FOUR LEFT * * *"; *No. 19*, "MAKE THIS A FULL STOP HOLD SHORT OF EIGHT IF POSSIBLE" (a command that was followed even without a formal final clearance to land by the tower controller); *No. 21*, to "PULL AHEAD SLIGHTLY ALLOW THE DC THREE TO PASS BEHIND YOU"; and *No. 37*, "HOLD YOUR POSITION"— and then, as soon as the Japan Airlines DC–8 had cleared the intersection, two clearances were given in immediate succession to the C–47 and Piper to take off, with but a cursory run-of-the-mill caution as to turbulence of the departing DC–8, which is perfunctorily given as to all large airplanes in or near the airport, whether they be taking off, landing, or high in the air traffic pattern around the airport.

Under the circumstances, it is not surprising—indeed this Court feels that in view of the overwhelming and ample evidence of hazard available to all tower personnel, it should have been anticipated— that a pilot or pilots in a small plane like the Piper, a short distance from the intersection where it had been placed by the controller's command, might interpret the clearance as another command for immediate takeoff with no full realization of the enormous hazard to which they would be exposed by such immediate takeoff into, and at an acute angle with, the path of the turbulence created less than a minute before. The Chief Controller Garcia and Mr. Capellas both saw the Piper immediately takeoff in the direction in which they were headed, and Chief Controller Garcia in effect admitted that he knew that it was taking off without waiting, and Garcia then knew or should have known that this was far too soon under the well-known "rules of thumb" for the turbulence to subside to a reasonably safe degree. While this does not excuse Baker, whose duty was of the

11. In an attempt to avoid this conclusion, government's witness Carmody testified that controllers were trained to allow the minima, and "not much more than the minima" or words to that effect, in giving separation clearances. The Court has searched in vain for any law, rule, regulation, or directive so mandating controllers.

highest to furnish to Furumizo an instructor pilot who so well knew of the imminent hazards of such a takeoff that he would have held back until the turbulence could be reasonably assumed to have safely subsided—as was done by the pilots of the C-47—it would seem that if any combination of circumstances could reasonably be calculated to lull a pilot, insufficiently informed in the hazards of wake turbulence, into taking off instantly and prematurely, with a mistaken sense of assurance that the turbulence warning was a routine one and did not connote an immediate, acute and lethal hazard, this was it. Discretion and judgment should have been exercised by the controllers to avoid this acute and obvious hazard, whereas Chief Controller Garcia emphatically testified that he did not consider that he had any duty, and did not even attempt, to exercise any judgment or discretion whatsoever, beyond giving the stereotyped routine cautionary language of the book. These considerations reinforce this Court's finding of negligence on the part of the government.

69. In accordance with the foregoing findings of fact and conclusions of law, the Court reaffirms its previous oral decision during the trial, finding the defendants Baker and the government equally negligent and liable to plaintiffs in equal shares, and denies all defenses raised by either of the defendants, both affirmative and otherwise, and now proceeds to assess damages.

## DAMAGES

70. The Court makes the following findings:

(a) At the time of his death, Robert Furumizo was twenty-nine years of age and had a life expectancy in excess of forty-two years. For the purposes of the computations and related findings made in this case, the Court adopts the figures of the actuary for defendant Baker, Mr. Coates, of 42.6 years, and a working life expectancy of 34.6 years (Ex. B-6-7).

(b) At that time decedent was a federal employee employed by the Federal Aviation Agency (FAA) with a rating of GS-7, and earning a base salary at the rate of $5,520.00 plus cost-of-living allowance (COLA) of $966.00, or a total of $6,486.00 per year. For the purpose of the computations and related findings made by this decision, the Court finds that the figures as to rates of salary and COLA set forth for Grades GS-7 and GS-9 in the schedules of Exhibits B-6-1 and B-6-4 are correct and adopts those figures. The same schedules have been accepted as substantially correct, by the plaintiffs, with certain exceptions which do not question the accuracy of the grades, dates and effective periods of the various rates, and steps or increments within grades, base salary rates, and amounts of COLA. In so finding, however, this Court does not adopt any theory indicated by one or more of such Exhibit B-6 schedules which is inconsistent with the rulings herein made.

(c) The work record and evidence concerning this decedent overwhelmingly indicate that he was of exemplary character, far above average in mental endowment, intellectual ability, originality, ambition, industry and drive. A graph of his numerous awards, promotions and achievements, not to mention the honors bestowed upon him, would show his rising continuously and rapidly at a very steep angle toward the top of his chosen fields. Not content with doing very well any job he had at hand, whether in the military, FAA or otherwise, he took extension courses, did homework and in almost every conceivable way sought to, and did, improve his education, knowledge, skills and qualifications. In his grades in such courses he made ratings of 9 in most of his subjects, with only a few 8's or lower, 9 being the highest grade attainable. As stated by plaintiff's counsel, decedent was "on his way" to the top. Any prognosis for the future is conjectural to a certain extent, but this

Court holds that the evidence, as clearly as it is possible to demonstrate, justifies a finding that Robert Furumizo would have been promoted to GS–9 by September 1, 1963, would have achieved or would achieve the successive steps of base salary in that grade at least as early as the dates indicated in Exhibit B–6–4, and would be promoted within a reasonable time to GS–11. The testimony of the witness Wong indicates that a man of decedent's high ability, qualification and drive could normally expect to be promoted to GS–11 in from three to six years, with certain contingencies, such as transferring to a different branch and availability of open positions. To be conservative, this Court finds that with reasonable certainty he would have achieved the equivalent of GS–11 in base salary in not more than ten years after his promotion to GS–9.

(d) As to the question of whether COLA would be continued indefinitely during decedent's working life expectancy, this Court takes into consideration the well-known tendencies of all legislative bodies, including Congress, to avoid cutting the salary of any currently employed regular public employee, but rather to work out a long-range plan whereby existing salaries are adjusted in such manner as to fit gradually into any new salary plan without reduction. There are other indications that COLA would be continued indefinitely or absorbed into a base salary plan, including, among other things (1) the strategic position of Hawaii in the Pacific Ocean where crisis after crisis appears to be in prospect due to our nation's commitments and policies in East Asia and elsewhere around the Pacific, (2) the success of the Senators and Congressmen from Hawaii in so far preventing the abolition of COLA, notwithstanding strong recommendations by the federal civil service authorities, and the unanimous expressed determination of all such Senators and Congressmen to continue their efforts to maintain such COLA, and (3)

recent published studies reconfirming the high cost of living in Hawaii, of all of which, it is held, this Court may take judicial notice. This Court, therefore, believes that the evidence justifies a finding, and so finds, that there is a reasonable certainty that COLA at the rate of at least 15%, or its equivalent by absorption into a higher base salary schedule, would continue for at least ten years after 1963, and that thereafter the base salary for the grade of GS–11 would not be less than it is at the present time.

(e) It is even quite possible that COLA would be continued indefinitely. However, the Court feels that a reasonable basis for resolving the question of the continuance or non-continuance of COLA would be to hold, and the Court so holds, that it or its equivalent would be continued through 1973, and that beginning in 1974, GS–11, to which decedent would have advanced, would continue, even without COLA, at not less than the present base salary rates therefor. On this basis, the final result would not be substantially different from that reached by Mr. Coates in Schedule B–6–4 on the assumption that COLA would continue for GS–9 for the full working life expectancy of decedent, and that he would not be promoted to GS–11. Hence, we can, conservatively, adopt the figures of Schedule B–6–4 and the computations based thereon, for purposes of computing salary and pension losses of the decedent, and through him, of plaintiffs. The Court finds that this would achieve a substantially just final result.

(f) The Court finds that an interest or discount rate of 3¾% per year is reasonable under the circumstances for purposes of ascertaining the present value of estimated future losses. Among other things, all parties have approved this rate as a reasonable one.

(g) In this connection, the Court rejects, as unduly speculative, plaintiff's contention that an inflationary rate of some 2⅓ to 3% or more per year

**1014**

should be added progressively to each salary rate shown in the Coates schedules, B–6 series, for GS–9.

(h) The Court finds that, inasmuch as the plaintiffs were entitled to damages as of the date of death, June 19, 1961, of Robert Furumizo (June 20, however, being used in all calculations), but the final determination and award of damages has been delayed for four years up to approximately June 20, 1965, therefore it would be unfair and unjust to plaintiffs to compute all present values of future losses back to June 20, 1961, and that they should be computed without discount up to June 20, 1965, and thereafter by discounting all values as of June 20, 1965. Accordingly, the figures as to present values set forth in the Shedules of Exhibits B–6–10 and B–6–11, have by the Court, been adjusted so as (1) not to discount any losses of salary that would have been payable up to June 20, 1965, and (2) so as to discount all other future such losses only as of June 20, 1965. This has been done by taking Mr. Coates' present values (as of June 20, 1961) for the latter figures in Schedules B–6–10, B–6–11, and B–6–20, and multiplying the total of his present values (after deducting the figures of clause (1) next preceding this sentence) by an interest factor for four years compounded annually at 3¾% (or 1.15865).

(i) The Court finds that the so-called minority rule [12] contended for by defendants, for deduction of estimated income taxes, is the more modern and reasonable one and holds that such estimated taxes should be deducted from the total estimated loss of earnings of the decedent. In this connection, this Court adopts the estimate of Coates set forth in the Schedules of Exhibits B–6–14 and B–6–15, showing a total present value of $18,856.15 for such federal income taxes. Although the plaintiffs and defendant

Baker seem to admit in their last supplemental memos that this computation might have overlooked the fact that interest earned by plaintiffs on the present values allowed as damages would be taxable, and therefore be a little excessive, this Court, while admitting the same possibility, believes that any such possible excess is at least offset (1) by the real possibility that COLA would be absorbed into base salary, thereby increasing the amount of such federal income taxes, (2) by the omission of any estimated state taxes, which appear almost, if not fully, as certain as federal income taxes, and (3) by the greater proportion of damages allotted to Mrs. Furumizo by this Court.

(j) As intimated above, this Court finds that the allocation of monetary loss of support for Cynthia should go to Mrs. Furumizo, who, as mother of Cynthia, now has the sole duty and obligation to support her child. R.L.H. 1955 § 330–5. Thus the Court holds that the 20% claimed in behalf of plaintiff Cynthia for loss of such support should go to Mrs. Furumizo, as well as the 10% claimed for the estate, representing what Mrs. Furumizo testified to as the amount that the decedent put aside as savings. A husband and father of the type which decedent is shown by the evidence to have been, would surely have ultimately used these savings for the benefit of his wife and child, he being rather frugal as to himself but most generous as to his family. For the same reason, the Court finds that, as to the balance of income over and above the 35% expended by decedent for himself, and over and above his retirement system contributions, his family would have received the full benefit of all of such balance. Hence there is no need to allocate to any plaintiff other than Mrs. Furumizo any portion of the lost earnings over and above the 35% expended by decedent on himself, and such

12. Southern Pac. Co. v. Guthrie (9 Cir. 1951) 180 F.2d 295, 186 F.2d 926; O'Connor v. U. S. (2d Cir. 1959) 269 F.2d 578; and British Transport Com. v. Gourley (1956) AC 185; and other cases cited in defendant Baker's brief on damages filed May 5, 1964, pp. 4–14.

retirement system contributions, by the decedent as a deduction from his total income.

■ (k) As intimated by the last such paragraph, this Court sustains and adopts, as reasonable under all the evidence, the contentions of defendants that, in addition to estimated federal income taxes, there should be deducted from decedent's total estimated salary losses the amount of his contributions to the federal retirement system. The evidence seems to this Court a bit ambiguous as to whether the 35% testified to by Mrs. Furumizo as being the proportion of income spent by decedent on himself, included retirement system contributions. This Court gives the benefit of the doubt to the defendants on this item. However, this Court rejects the contentions of defendants that there should also be simi-larly deducted estimated premiums that would have been paid by decedent on life insurance, had he survivéd. The Court feels that there is insufficient evidence upon which to base any such estimate, in the absence of evidence as to such factors as: (1) the nature and terms of the respective insurance policies, (2) other indications that decedent would have maintained for the rest of his working life or a particular number of years, a certain amount or certain amounts, of life insurance at a specified rate or specified rates of premium, (3) whether or not any dividends or return premiums would be paid by the insurance company or companies concerned, etc.

■ 71. In accordance with the foregoing preliminary rulings, the Court now computes damages as follows:

(a) To the Estate of decedent:

For funeral expenses (the Court here making no distinction between the defendants, as contended for by plaintiffs.) $ 613.93

Minus V.A. burial allowance 250.00

$363.93

For decedent's pain and suffering during the descent of the Piper plane, its crash to the ground, and the burning of decedent to death, the Court believing and finding from the evidence that he did suffer, however briefly, great agony from this horrible conflagration, $15,000.00.

In this connection, the Court believes this amount is not out of line with a number of previous awards for sudden death, by drowning or other accidental causes, when one takes into consideration the decreasing value of the dollar in the past since such awards were made and the circumstances of this case.

Total award to Estate $15,363.93.

(b) We now compute decedent's total loss of future earnings, and the amounts that should be allocated to the plaintiffs, Mrs. Furumizo and Cynthia, as follows:

Using Mr. Coates' figures from Exhibit B–6–4 and the Court's own computations of the proportion of 1965 salary that would have been earned up to June 20, 1965, the total amount which decedent would have earned to

June 20, 1965, without any discount back to June 20, 1961, is (Item 1)        $ 29,391.21.

Using the figures from Exhibits B–6–4, B–6–5, B–6–6 and B–6–10, B–6–11, with COLA or equivalent for GS–9 until 1973, and thereafter GS–11 without COLA which would come to substantially the same amount as GS–9 with COLA, for the full balance of the working life expectancy of decedent, we deduct from the total of present values of salary found by Coates (Ex. B–6–11), namely (Item 2),        $182,660.69

the amount of Item I above, namely,     K    29,391.21

leaving a balance of (Item 3),        $153,269.48.

Adding thereto 3¾% interest per year compounded annually, from June 20, 1961, to June 20, 1965, in order to eliminate an unfair discount back to June 20, 1961, shown in Mr. Coates' schedules in Exhibits B–6–10 and B–6–11, we multiply said balance of $153,269.48 shown in Item 3 above, by a factor of 1.15865 and adjust said balance upward to (Item 4),        $177,585.68.

We then similarly adjust the present value of pensions found by Coates (Ex. B–6–11), namely, (Item 5)    $ 14,131.43,

by multiplying the amount of Item 5 by the same interest factor of 1.15865, to eliminate the "unfair discount" back to June 20, 1961, and we adjust Item 5 upward to, (Item 6)        $ 16,373.38.

We now add Items 1, 4 and 6, above, and reach a grand total of salary and pension losses, discounted only to June 20, 1965, of, (Item 7)        $223,350.27.

From Item 7 we deduct, first, total present value of retirement system contributions Ex. B–6–20 and B–6–19) amounting to, (Item 8),        $ 10,314.95
leaving a balance of, (Item 9)        $213,035.32.

From this we deduct total present value of estimatter federal income taxes, which would have been paid by decedent (Exs. B–6–19, B–6–20), amounting to, (Item 10),        $ 18,856.15
leaving a balance of, (Item 11)        $194,179.17.

From this balance we deduct decedent's 35% of net income expenditures for his own needs, amounting to, (Item 12),        $ 67,962.71
leaving a net balance of, (Item 13)        $126,216.46.**

---

** NOTE: We have not followed Mr. Coates' method of computing the 35% of decedent first against the total present value (i.e. our Item 7 of $223,350.27 vs. Coates' total of $196,792.12) and then deducting from the resulting balance the present values of retirement system contributions and income taxes, as we consider this unfair.

■ The Court apportions this entire amount of Item 13, namely $126,216.46, to Mrs. Furumizo as the one person solely responsible for the support of Cynthia, as well as herself.

■ (c) As to the love, affection, society, companionship, comfort, protection, and parental care, training, guidance and education, lost by Cynthia, the Court preliminarily observes that at her tender age she could not realize as would an older child, the initial shock and grief of the loss of her father's life. However, her father was no ordinary run-of-the-mill parent. He was a highly intelligent, accomplished and gifted father whose ambition, pride and consideration for his family, belief in higher education and plans for his child, and all other indications in the evidence, gave assurance that, had he lived, he would indeed have contributed (in addition to monetary support) a great deal in the way of training, assistance and advice, plus great love and affection. Had he lived, he would indeed, aside from mere monetary considerations, have been amply endowed to enrich, and would have enriched, her life by his presence, example, aid, and everything, aside from money, that a gifted, devoted and highly affectionate, intelligent, educated, generous and considerate parent could contribute to a child from babyhood through college. Considering, however, that the Court would only allow damages for the period until her maturity at age 20, under Hawaii law (the government inadvertently uses 21 years) the Court feels that a reasonable amount of damages for this item alone, would be $30,000.00. The Court fully realizes that there is no pecuniary yardstick which can truly measure such damages, and if sentiment and sympathy alone were controlling, astronomical amounts of damages for the loss of such a loved one could be arrived at. The above figure has been reached only after careful consideration of numerous other awards for similar or near-similar cases, taking into consideration the diminishing amount of purchasing power of the dollar

as to the older cases, and any similarities or dissimilarities between the present case and such other cases. Accordingly judgment will be entered in favor of the plaintiff, Cynthia Furumizo in the amount of $30,000.00 for this item.

■ (d) Now as to the plaintiff, Betty Furumizo, for society, companionship, comfort, consortium, protection and marital care, attention, advice and counsel, lost by her, again this Court has not only carefully weighed all of the evidence in this case, but has laboriously compared the present case with a great number of similar or near-similar cases, including Ginoza v. Takai (1955) 40 Haw. 691, and United States v. Harue Hayashi, U.S.D.C. Haw. 9th Cir. 1960, 282 F.2d 599, 84 A.L.R.2d 754, cited by both plaintiffs and defendants, the Hayashi case being, in this Court's opinion, more nearly comparable in its facts and circumstances. This evaluation has included, among other things, an attempt, first to classify each case studied as a "plus" or "minus" case, adding to or deducting from the award in such case estimated proportionate amounts for such factors, among others, as (1) comparison of ages and life expectancies of the deceased spouse and of the surviving spouse; (2) the health and circumstances of the surviving spouse, bearing, among other things upon the more obvious needs of the surviving spouse for care, attention, etc.; (3) the economic and educational status and earning power of the deceased spouse, bearing, among other things, upon the kind of help, care, affection, etc., which such deceased spouse would have been capable of giving and would probably have given had he or she lived; (4) the decrease in the purchasing power of the dollar since the date of the death of such deceased spouse in each case, this Court feeling that it can and should take judicial notice that the dollar has been shrinking over the years as much as between 2 and 3% per year since 1941, and in the case of even earlier decisions, much more.

Using these studies merely as a rough yardstick to get the "feel" of a reason-

able range for such an award in 1961 under the circumstances of this case, the Court feels that an award somewhere between $40,000 and $60,000 would not be out of line.

The Court fully appreciates that in the Hayashi case, a federal judge in Hawaii awarded the widow $72,000 for loss of consortium, etc., (aside from the loss of monetary support). But, to give an illustration of how this Court has tried to strike a basis for comparison between the present and previous awards of other courts, some of the Court's reasoning with respect to the Hayashi case is as follows:

In Hayashi, the wife, aged 35, was a bedridden paralytic at the time of her husband's death, and had five children, aged 6, 8, 11, 13 and 15, to take care of, and the husband's earning power and prospects of advancement were much more limited than in the present case. Thus it clearly appeared that she needed and received much more personal help and attention from her husband, because of her condition, than would a normally healthy individual, and there was practically no chance of her ever remarrying because of her age and condition and the fact that she had five children. In the present case we have a healthy, well-educated, attractive young woman, only 27 years old, in 1961, with a single young child, who has a much better prospect of remarriage and much greater earning ability than Mrs. Hayashi, and who, though given much attention by her husband, needed constant physical help and moral encouragement not nearly as much as Mrs. Hayashi. In Hayashi, the husband had to make up in actual physical help and personal effort what he could not furnish in the way of monetary contributions, whereas in the present case Mr. Furumizo was able to and did contribute a great deal in the way of monetary considerations to his wife's comfort and welfare, although he was also as kind, generous and loving a husband as could be desired. The Court can not rationalize from the Hayashi case a

ratio of general to special damages to be applied to this case, as contended for by plaintiffs, but must consider all aspects of each case, using other cases only as a rough range-finding guide to be considered with all other circumstances.

The Court does feel, however, although no formula can be derived from the cases, that in awarding general damages as against special damages, judges and jurors probably and naturally take into consideration, as being somehow interrelated, with one influencing the other, to some degree, the amount of the purely monetary loss of income or special damages, which is more susceptible of mathematical computation. It is this Court's impression that, where the mathematically computable loss award is small, there is a tendency to increase the general damages in proportion to the special damages award, whereas, when the monetary loss award is rather large, there is a tendency to award a lower amount of general damages in proportion to the special damages. As contended by defendant Baker, it is true that a husband's love and affection are to some extent shown by the money he spends on and for his wife, and this court feels that there is some possibility of overlapping awards if one is too liberal in determining the general damages in addition to a large special damage award of monetary losses.

On the other hand, though needing physical help less than Mrs. Hayashi, Mrs. Furumizo would have had added to her life, if her husband had not perished, a great enrichment in the way of what her gifted and generous husband could and would have contributed, besides money. This type of contribution, it does not appear that Mr. Hayashi would have made in nearly the same degree. However, Mrs. Hayashi would need her husband's help more and more as each year went by, whereas it is believed that a young woman (however heart-rending would be the immediate loss) would be much better able to endure the loss as the years went by. Weighing these two cases thus, as well as taking into consid-

eration numerous other cases, as above stated, and all other circumstances, this Court finds that, for this item of damages, a reasonable amount is $50,000.00.

The very attempt to make comparisons with awards in other cases, makes any explanations and reasoning of the Court sound brutal and heartless, yet, if one is to decide the matter on any basis other than pure sentiment and sympathy, which has greatly troubled this Court, something like this must be done (there being no jurors from whom the court could get a consensus of what would be reasonable, yet realistic). It is idle to say that any award in money will fully make up for, and in that way fully compensate, a wife for the loss of the love and comfort of a beloved and exemplary husband. In a sense, nothing material can. However, this Court must fix a monetary amount for this loss and this Court feels that it is not amiss for a judge in a case like this to try to put himself in the place of average citizens and jurymen, and try to reach an amount that he has reason to believe would approximate what such a jury in his community, without undue emotional influence, would award as reasonable. This the Court has tried to do, along with all other efforts hereinabove described.

72. To sum-up the foregoing as to damages, judgment will be entered as follows:

(a) In favor of the plaintiff, Betty K. Furumizo, Administratrix of the Estate of Robert Takeo Furumizo, Deceased, in the total amount of $15,363.93, together with costs.

(b) In favor of Cynthia H. Furumizo, for loss of love, affection, society, companionship, comfort, protection and parental care, training, guidance and education, $30,000.00, together with costs.

(c) In favor of Betty K. Furumizo, as Widow of the decedent in a total amount of $176,216.46, together with costs.

The foregoing will constitute the Court's findings of fact and conclusions of law.